**WOODWARD SAND COMPANY, INC., and Sorrento Sand Company, Inc., Plaintiffs-Appellees,**

v.

**The WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, Defendants-Appellants.**

No. 85–5677.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1985.

Decided May 5, 1986.

Albert T. Harutunian III, Luce, Forward, Hamilton & Scripps, San Diego, Cal., for plaintiffs-appellees.

Kirke M. Hasson, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellants.

Before WALLACE, ANDERSON, and NORRIS, Circuit Judges.

J. Blaine ANDERSON, Circuit Judge:

The Western Conference of Teamsters Pension Trust Fund (the Fund) appeals from the district court's denial of its summary judgment motion and from the district court's granting of Woodward Sand Company's (Woodward) motion for summary judgment. Specifically, the Fund contends that Woodward is obligated to pay the employer withdrawal liability assessment levied by the Fund in accordance with the requirements of the Employee Retirement Income Security Act (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (the MPPAA). Because the district court failed to rule on the dispositive issues and failed to apply the appropriate standard of review to the Arbitrator's findings, we reverse and remand this case to the district court for further consideration.

## I. FACTS

On August 16, 1977, Woodward and other members of the San Diego County Rock Producers Association entered into a collective bargaining agreement with Building Material and Dump Truck Drivers, Local No. 36 (hereinafter "Union" or "Local 36"). In this agreement Woodward recognized Local 36 as the collective bargaining agent for its employees. Woodward also agreed to make pension contributions to the Fund on behalf of its employees and to be bound by the Fund's Agreement and Declaration of Trust. On August 15, 1980, the collective bargaining agreement between Woodward and Local 36 expired without the parties reaching agreement on the terms of a new contract. The following day the Union went out on strike. Woodward responded by permanently replacing the striking employees.

As a result of negotiations held on September 23, 1980, representatives of the Union and Woodward believed that they had reached oral agreement on the terms of a new contract. The employee members ap-

proved a written version of the new agreement on September 25, 1980.

Woodward did not receive the written agreement until after October 1, 1980. On or about September 29, 1980, a point of dispute had arisen: the Union asked Woodward to arbitrate the issue of rehiring the permanently replaced striking employees. Woodward refused to sign the written agreement, contending that it did not accurately reflect the terms orally agreed upon.

For the next eight months, Woodward and the Union continued to deal with each other in order to determine whether they had, in fact, reached a new collective bargaining agreement. During this interim period, Woodward rehired two of the former strikers to fill vacancies in its workforce.

During the time between the expiration of the collective bargaining agreement in August 1980 and May 1981, Woodward continued making pension contributions to the Fund for its employees. Woodward's contributions to the plan were made at a higher hourly rate than that provided for in the prior expired agreement in accordance with Woodward's rate agreed to orally on September 23, 1980.

Woodward and Local 36 were unable to negotiate a new agreement. Woodward stopped making its pension contributions to the Fund in June 1981. An election was subsequently held and the Union was decertified as the bargaining representative of Woodward's employees.

After Woodward withdrew, the Fund assessed it $132,086.04 in employer withdrawal liability in accordance with the MPPAA. The Fund found that Woodward had not withdrawn from the Fund prior to September 26, 1980 (the effective date of the MPPAA) and was therefore subject to withdrawal liability assessments. The Fund established a monthly payment schedule of $4,194.40 for Woodward commencing on February 11, 1983. Woodward did not make this first payment when due or any of the subsequent monthly payments.

On March 2, 1983, pursuant to statutory procedure (29 U.S.C. § 1399), Woodward asked the Fund to reconsider several matters relating to the Fund's assessment. The Fund issued its final decision reaffirming the correctness of its previous determination.

On June 8, 1983, Woodward initiated arbitration to challenge the Fund's assessment. Both parties agreed to waive a hearing and to submit the issues and contentions to arbitration on the briefs and evidentiary exhibits. The Arbitrator found that the determination made by the Fund that Woodward had not withdrawn from the plan prior to September 26, 1980, was neither unreasonable nor clearly erroneous. The Arbitrator found that no impasse had been reached before that time and held that "on the contrary, as I understand the meaning of the word 'impasse' it would appear that this did not occur at least until sometime in 1981[.]"

After the Arbitrator issued his decision, Woodward sought an order vacating the arbitration award. The Fund counterclaimed seeking enforcement of the award. The matter was brought before the district court for hearing on cross-motions for summary judgment.

The district court denied the Fund's motion and granted summary judgment for Woodward. The district court ruled that Woodward's withdrawal from the Fund occurred prior to September 26, 1980, the date the MPPAA was enacted, thereby resulting in no withdrawal liability. The determination was based on a ruling that Woodward had no obligation as a matter of law to make contributions to the Fund on behalf of the strike replacements or the two strikers rehired months after MPPAA was enacted. Although the issue was presented below, the district court failed to rule whether Woodward was estopped to deny its obligation to contribute under MPPAA. The district court entered judgment vacating the Arbitrator's award and setting aside the Fund's assessment against Woodward.

## II. DISCUSSION

### A. Statutory Background

The Fund is a "multiemployer pension fund" which administers a "multiemployer pension plan" regulated under the provisions of ERISA (29 U.S.C. § 1001, et seq.). It accepts and manages pension contributions paid by participating employers and pays pension benefits to these employers' employees.

In a "defined benefit" pension plan, such as the one administered by this Fund, an employee's pension is not calculated directly on the basis of the contributions made for him by his employer. *See Connolly v. Pension Benefit Guaranty Corporation*, 581 F.2d 729, 733 (9th Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). For example, an increase in an employee's hourly rate may elevate the level of his or her benefit entitlements for prior years, even though those years were compensated at lower rates. Thus, an employer's hourly contributions (e.g., 70¢ per hour) do not necessarily cover the vested benefit cost. As a result, defined benefit plans can have a significant "unfunded vested benefit liability"—the shortfall between the assets of the pension fund (the hourly contributions paid by employers, plus earnings thereon) and the actuarial value of vested pension rights of the employees. *Id.*

Prior to the enactment of the MPPAA, employers could withdraw from pension plans without paying their share of the plans' unfunded vested benefit liability. *See Bd. of Trustees of the Western Conf. of Teamsters Pens. Trust Fund v. Thompson Building Materials, Inc.*, 749 F.2d 1396, 1401–02 (9th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985). The employers could simply cease making pension contributions (e.g., by ceasing covered business) and avoid any responsibility for the actual, but unfunded, liabilities of the plans. The other employers remaining in the plan were forced either to assume these additional liabilities or to withdraw, resulting in unfairness to the remaining employers or insolvency of the plan. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 722, n. 2, 104 S.Ct. 2709, 2714, n. 2, 81 L.Ed.2d 601, 606–07, n. 2 (1984).

■ To alleviate these problems, Congress established a system for computing and assessing the liability of employers who withdraw from pension plans. 29 U.S.C. § 1361, et seq. This system is designed to make employers pay their share of the real cost of pensions, by paying a share of the difference between the assets already contributed and the vested benefit liability. *R.A. Gray & Co.*, 467 U.S. at 723, 104 S.Ct. at 2714–15, 81 L.Ed.2d at 607. When an employer withdraws from a multiemployer pension plan, such as the one administered by the Fund, ERISA requires a withdrawing employer to compensate a pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal. *Id.* 467 U.S. at 724, 104 S.Ct. at 2715, 81 L.Ed.2d at 608. This "withdrawal liability" is assessed against the employer to "ensure that employees and their beneficiaries [are not] deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Id.* 467 U.S. at 720, 104 S.Ct. at 2713, 81 L.Ed.2d at 605.

However, because of the enactment of the Deficit Reduction Act of 1984, Pub.L. 98–369, § 558, 98 Stat. 494, 899 (1984), into law, any employer who withdrew from a multiemployer pension plan prior to September 26, 1980 (the date the MPPAA was enacted) could not be assessed withdrawal liability.

Employer challenges to withdrawal liability assessments are committed to a complex statutory procedure requiring review by the Fund followed by arbitration. 29 U.S.C. §§ 1382, 1399, 1401.

### B. Complete Withdrawal

In accordance with the requirements of ERISA, as amended by the MPPAA, "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal ... then the employer is liable to the plan in

the amount determined ... to be the withdrawal liability." 29 U.S.C. § 1381(a). "The term 'complete withdrawal' means a complete withdrawal described in section 1383 of this title." 29 U.S.C. § 1381(b)(2). "[A] complete withdrawal from a multiemployer plan occurs when an employer—(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a).

Neither party contends that Woodward has permanently ceased all covered operations under the multiemployer plan. Therefore, the focus is on whether Woodward permanently ceased to have an obligation to contribute under this plan. For purposes of this statute, the term "obligation to contribute" means "an obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements, or (2) as a result of a duty under applicable labor-management relations law ...." 29 U.S.C. § 1392(a).

The collective bargaining agreement between Woodward and the Union expired on August 15, 1980. No new agreement between the parties was ever adopted. Therefore, there was no obligation to contribute under one or more collective bargaining agreements.

The Fund argues, however, that Woodward does have an obligation to contribute as a result of a duty under applicable labor-management relations law. The Fund contends that Woodward had a duty to contribute to the pension plan until negotiations between it and the Union reached impasse. The law in this area is well settled.

> During the negotiations following the expiration of a collective bargaining agreement, the employer is required to "maintain the status quo as to wages and working conditions." *Peerless Roofing Co., Ltd. v. NLRB*, 641 F.2d 734, 736 (9th Cir.1981). The obligation to maintain the status quo encompasses the obligation to continue making pension fund contributions. *Id.* The obligation continues until negotiations reach an impasse. *Hinson v. NLRB*, 428 F.2d 133 (8th Cir.1970).

*Producers Dairy Delivery v. Western Conference*, 654 F.2d 625, 627 (9th Cir. 1981).

■ We find, for two reasons, that this case must be remanded to the district court for further deliberations. First, the district court failed to make a final ruling on whether or not an impasse had been reached. This is the dispositive issue in this case. Woodward had an obligation to continue to maintain the status quo after the collective bargaining agreement had expired. Thus, Woodward was required to make pension fund contributions until negotiations reached an impasse. The district court held that "the determining factor as to whether the obligation to contribute ceased or not depends upon analyzing the interests of [the] two rehired workers." Reporter's Transcript p. 24 ls. 21–25. He then found that "the obligation to contribute ceased on August 16 [sic] [1980] ... when the collective bargaining agreement expired." Reporter's Transcript p. 25 ls. 8–10. The "interests of two rehired workers" is not the determinative factor in this case. What must be decided by the district court on remand is whether or not an impasse in negotiations had been reached between the two parties and, if so, whether that impasse was reached before or after September 26, 1980.

■ This brings us to our second reason for remanding this case. The district court failed to apply the proper standard of review to the findings of the Arbitrator. In accordance with ERISA, as amended by the MPPAA, "any determination made by a plan sponsor ... is presumed correct unless the party contesting the determination shows by a preponderance of the evidence that the determination was unreasonable or clearly erroneous." 29 U.S.C. § 1401(a)(3)(A). In addition, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." 29 U.S.C. § 1401(c). In the present case, the Fund found that Woodward's date of complete withdrawal occurred on June 1, 1981, and therefore, that Woodward did not withdraw from the plan

before September 26, 1980. The Arbitrator, using the proper standard of review, found that "the determination made by the Fund that an impasse had not been reached before September 26, 1980 [was] [n]either unreasonable [n]or clearly erroneous; on the contrary, as I understand the meaning of the word 'impasse' it would appear that this did not occur at least until sometime in 1981[.]" Excerpt of Clerk's Record, pgs. 216–17. The Arbitrator based its findings on the following analysis:

Here there is no contention that the parties had reached impasse before September 26, 1980. The parties, both of whom had modified their positions on wages after the strike occurred and the replacements were hired, were *still negotiating* the terms of the new agreement *after that date*. Throughout the negotiations Woodward manifested its understanding and acceptance of the obligation to maintain continuity of pension benefits. Consistent with its understanding, it continued to make payments into the Fund.

Excerpt of Clerk's Record, pgs. 215–16 (emphasis added). The Arbitrator's factual findings on whether the parties' conduct and dealings before and after September 26, 1980 amounted to an impasse are presumed correct. 29 U.S.C. § 1401(c); *see Bd. of Trustees v. Thompson Bldg. Materials, Inc.*, 749 F.2d 1396, 1405–06 (9th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985). The district court's failure to apply such a presumption to the Arbitrator's findings is erroneous. Such a presumption is an important part of the review process and must be applied on remand.

Woodward raises several arguments why the issue of whether an impasse was reached prior to September 26, 1980, "is not germane to this appeal." First, Woodward argues that an exception has been carved out of the impasse rule which allows for the obligation to contribute to a pension plan to cease if an employer replaces strikers prior to an impasse. As stated above, the general rule is, in the absence of a true impasse in negotiations, an employer may not unilaterally change

the terms and conditions of employment. *See Producers Dairy*, 654 F.2d at 627. However, it has been held that this duty does not extend to the terms and conditions of employment for replacements of striking employees. *Capitol-Husting Co., Inc. v. NLRB*, 671 F.2d 237, 246 (7th Cir.1982); *Leveld Wholesale, Inc.*, 218 N.L.R.B. 1344 (1975). The underlying rationale for the lack of duty to contribute on behalf of replacements was "that the interests of strike replacements are different from those of strikers and the Union cannot be expected to effectively represent these conflicting interests." *Capitol-Husting*, 671 F.2d at 246. The NLRB applied similar reasoning in *Leveld*.

Even after termination of a contract a union represents all the employees in the bargaining unit. That includes both strikers and strike replacements. However, the interests of the two groups are not the same. Strike replacements can reasonably foresee that, if the union is successful, the strikers will return to work and the strike replacements will be out of a job. It is understandable that unions do not look with favor on persons who cross their picket lines and perform the work of strikers.

*Leveld*, 218 N.L.R.B. at 1350. The district court in the present case based its decision on the differing interest between the permanent replacements and the two rehired workers. However, the rationale underlying the exception to the impasse rule established by *Capitol-Husting* and *Leveld* does not apply to the present case. The interests of the permanent replacements and the rehired strikers are less antithetical in the case at bar. The strike was over prior to September 26, 1980. Therefore, there was no picket line to cross as in *Leveld*. The Union had made an *unconditional* offer to return to work. The replacements were permanent with no fear of losing their jobs to the strikers as in *Leveld*. But most importantly of all, in *Leveld* the NLRB found specifically that the strikers had returned to work *after an impasse* had been reached in the negotiations for a new contract. Thus the employer was making a "post impasse unilateral change in working

conditions that was consistent with its rejected offer to the Union," ... a change it could lawfully make.

The *Capitol-Husting* and *Leveld* cases are, therefore, inapposite and not determinative of the dispositive issue of whether or not an impasse had been reached between the two parties by September 26, 1980.

■ Woodward also argues that its obligation to contribute did not continue merely because it rehired two strikers after September 26, 1980. According to the statute, complete withdrawal occurs when an employer "permanently ceases" to have an obligation to contribute. 29 U.S.C. § 1383(a)(1). Assuming no impasse had yet occurred, the obligation to contribute, at least as to the rehired strikers, had not yet *permanently* ceased because an employer may not unilaterally change employment terms and conditions prior to impasse. Furthermore, our finding that *Capitol-Husting* and *Leveld* do not apply to this case, coupled with the general rule that a Union represents all workers, including replacements, thereby requiring that contributions be made on their behalf, leads to the conclusion that the obligation to contribute on behalf of the replacement workers did not *permanently* cease prior to September 26, 1980.

Finally, Woodward argues that even if it did have an obligation to contribute on behalf of the two rehired strikers, such a *de minimis* contribution should not result in withdrawal liability. However, the authority used by Woodward in support of this contention involves a part of the statute not involved in this case. In each of the cases cited, the courts considered whether employers had completely withdrawn under the permanent cessation of all covered operations test (29 U.S.C. § 1383(a)(2)), not the alternative permanent cessation of the obligation to contribute test (29 U.S.C. § 1383(a)(1)), which applies here. *See Textile Workers Pension Fund v. Standard Dye & Finishing Co., Inc.*, 607 F.Supp. 570 (S.D.N.Y.1985); *F.H. Cobb. Co. v. New York State Teamsters Conference*, 584 F.Supp. 1181 (N.D.N.Y.1984); *Speckman v. Barford Chevrolet Co.*, 535 F.Supp. 488 (E.D.Mo.1982). Furthermore, there has been no case applying this *de minimis* rule to the part of the statute involved in this case.

**C. Estoppel**

■ One further issue was raised by the Fund before the district court. That issue was whether Woodward is now estopped to deny its obligation to contribute to the pension plan, whether it was obligated to do so or not, because it continued to submit such contributions after September 26, 1980. Although the issue was presented to the district court, it was dismissed as an "interesting" problem. On remand, we direct the district court to make specific findings as to the elements of estoppel, if necessary. *See Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1096 (9th Cir.1985). Estoppel principles have been applied to pension plans. *Id.* In examining the principle of estoppel, as it relates to this case, we direct the district court's attention to *Producers Dairy Delivery v. Western Conference*, 654 F.2d 625 (9th Cir.1981); *Carter v. CMTA–Molders & Allied Health & Welfare*, 736 F.2d 1310 (9th Cir.1984); and *Award Service, Inc. v. N. Cal. Retail Clerks Unions*, 763 F.2d 1066 (9th Cir. 1985), *cert. denied*, — U.S. —, 106 S.Ct. 850, 88 L.Ed.2d 890 (1986). In relation to the decision in *Award Service*, the district court may find it necessary to determine whether Woodward continued to make contributions due to a mistake of law or fact. *See Award Service*, 763 F.2d at 1070; 29 U.S.C. § 1103(c)(2)(A); *see also Emp. Health Trust v. Cassidy Trucking, Inc.*, 646 F.2d 865 (4th Cir.1981) (mistake of fact exists where employer erroneously believes there exists a binding contract between it and union). In addition, the district court should consider any "equities" that may exist in favor of either party. *See Award Service*, 763 F.2d at 1069.

**D. Attorneys' Fees**

Under ERISA, the award of attorneys' fees to a pension plan is mandatory in all actions to collect delinquent contributions. 29 U.S.C. § 1132(g)(2); *Lads Trucking Co. v. Bd. of Trustees, etc.*, 777 F.2d 1371, (9th Cir.1985); *Operating Engineers Pension*

*Trust v. Beck Eng. & Surveying,* 746 F.2d 557, 569 (9th Cir.1984); *Operating Engineers Pension Trust v. Reed,* 726 F.2d 513, 514 (9th Cir.1984); *Kemmis v. McGoldrick,* 706 F.2d 993, 997–98 (9th Cir.1983); *San Pedro Fisherman's Welfare v. DiBernardo,* 664 F.2d 1344, 1346 (9th Cir.1982).[1] This mandatory attorneys' fees provision applies in all actions to collect delinquent contributions owed under § 1145, including actions to collect unpaid employer withdrawal liabilities.[2] *Lads Trucking,* 777 F.2d at 1374. On remand, if the district court affirms the Arbitrator's findings and concludes that Woodward is obligated to pay withdrawal liability, the district court shall award to the Fund reasonable attorneys' fees and costs, including reasonable fees for this appeal.

REVERSED and REMANDED.

---

1. Section 1132(g)(2) provides that:

    "[i]n any action under this subchapter ... to enforce section 1145 of this title (§ 1145 pertains to delinquent contributions) in which a judgment in favor of the plan is awarded, the court shall award the plan—

    .  .  .  .  .  .

    "(D) reasonable attorney's fees and costs of the action, to be paid by the defendant...."

2. "In any action under this section to compel an employer to pay withdrawal liability, any failure of the employer to make any withdrawal liability payment within the time prescribed shall be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of this title)." 29 U.S.C. § 1451(b).