**UNITED FOODS, INC., Plaintiff,**

v.

**The WESTERN CONFERENCE OF TEAMSTERS PENSION TRUST FUND, et al., Defendants.**

**Nos. C–92–2725 MHP, C–92–2748 MHP.**

United States District Court,
N.D. California.

March 3, 1993.

## OPINION

PATEL, District Judge.

The Western Conference of Teamsters Pension Trust Fund and its Trustees ("the Fund"), defendant in action number C–92–2725 MHP and plaintiff in action number C–92–2748 MHP, and United Foods, Inc. ("United") bring this consolidated action, seeking review and modification of an arbitrator's calculation and award of United's withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381, et seq. The matter is currently before the court on cross-motions for summary judgment. Having considered the submissions and arguments of the parties, the court enters the following Memorandum and Order.

BACKGROUND

■ The Fund is a "multiemployer pension fund" which administers a "multiemployer pension plan" as defined by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(37)(A), and regulated under the relevant provisions of ERISA, 29 U.S.C. § 1001 et seq. The Fund collects amounts owed by various employers in the Western

United States and uses those funds to provide pensions and other benefits to employees of those employers. The plan is a "defined benefit plan" under ERISA, 29 U.S.C. § 1002(35), which means that employees' benefits are not limited solely to contributions made by the employer and therefore employer contributions do not necessarily cover the full cost of the employees' vested benefits. *Woodward Sand Co. v. Western Conference of Teamsters Pension Trust Fund,* 789 F.2d 691, 694 (9th Cir.1986). As a result, defined benefit plans often have an "unfunded vested benefit liability," that is, the difference between the fund's current assets and the present actuarial value of employees' vested benefits. *Id.*

Congress passed the MPPAA in 1980 to establish a system for calculating and collecting the unfunded vested benefit ("UVB") liability from employers who withdraw from pension plans. *See* 29 U.S.C. § 1381 et seq.; *Woodward Sand,* 789 F.2d at 694 (citation omitted). The MPPAA requires that when employers withdraw from a multiemployer pension plan regulated by ERISA, they must pay their proportionate share of the UVB as "withdrawal liability" so that the plan is compensated for benefits which have already vested with the employees at the time of the employer's withdrawal. *Id.* Otherwise, the financial burden of the employees' vested benefits would shift to other employers in the plan, and ultimately to the Pension Benefit Guaranty Corporation ("PBGC"), which insures such benefits. *Central States Pension Fund v. Slotky,* 956 F.2d 1369, 1371 (7th Cir.1992).

United contributed to the Fund under collective bargaining agreements with Locals 748 and 890 of the International Brotherhood of Teamsters in Modesto and Salinas, California. After various impasses in labor negotiations, United withdrew completely from the Fund in 1988. Pursuant to 29 U.S.C. § 1382, which requires the plan's sponsor to determine the amount of the employer's withdrawal liability, the Fund calculated United's withdrawal liability at $1,066,025.23.

In March 1990 United initiated arbitration under 29 U.S.C. § 1401 to challenge the Fund's withdrawal liability assessment. After extensive discovery, ten days of hearings, and weighty post-hearing submissions, the Arbitrator issued an award and a 98 page decision. The Arbitrator found that the actuarial methods and assumptions used by the Fund were "reasonable in the aggregate and not clearly erroneous" and therefore denied United's request to substantially reduce its withdrawal liability.[1] Arbitrator's Award ("Award") at 2. The Arbitrator did, however, hold that death benefits payable to a participating employee's estate or to relatives other than the surviving spouse or dependent children were improperly included in the UVB calculation and ordered that they be deducted from United's withdrawal liability and paid back. *Id.* Finally, pursuant to 29 U.S.C. § 1401(a)(2), the Arbitrator awarded the Fund $135,720 in attorneys' fees, $25,218 in expenses, and $95,254 in witness fees against United.

The Fund argues that the Arbitrator's ruling excluding the above mentioned death benefits from the UVB calculation was erroneous and the Fund's full assessment should be reinstated. Except for this slight modification, the Fund urges the court to enforce the Arbitrator's award.

United challenges the Fund's withdrawal liability assessment and the Arbitrator's award on several grounds: (1) forfeitable death, disability and early retirement benefits were improperly included in the UVB calculation for United's withdrawal liability assessment, (2) the Fund's actuarial assumptions were unreasonable in the aggregate, and (3) the Arbitrator's opinion should be vacated because he refused to hear pertinent and material evidence. United also maintains that the Fund's assessment was not entitled to any presumption of correctness because the Fund's trustees breached various statutory and fiduciary obligations. Fi-

---

1. The MPPAA provides that the arbitrator must presume that a plan's calculation of unfunded vested benefits is correct "unless a party contesting the determination shows by a preponderance of evidence that—(i) the actuarial assumptions and methods used in the determination were, in the aggregate, unreasonable . . ., or (ii) the plan's actuary made a significant error in applying actuarial assumptions or methods." 29 U.S.C. § 1401(a)(3)(B)(i)–(ii).

nally, United asks this court to vacate the Arbitrator's award of attorneys' fees and costs against them and seeks its fees and costs for the proceedings before this court and the Arbitrator.

## LEGAL STANDARDS

### I. *Summary Judgment*

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted:

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by [its] own affidavits, or by 'depositions, answers to interrogatories, or admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

The moving party does not surmount its initial burden through conclusory allegations as to the state of the material on file, however, it is not required to "support its motion with affidavits or other similar material negating the opponent's claim." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The moving party discharges its burden by showing that the nonmoving party has not disclosed the existence of any "significant probative evidence tending to support the complaint." *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968).

The court's function on a motion for summary judgment is not to make credibility determinations. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511. The inferences to be drawn from the facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.,* 809 F.2d at 631.

### II. *Scope of Review*

Under the MPPAA, an arbitrator's factual findings are presumed correct, and the presumption is "rebuttable only by a clear preponderance of the evidence." 29 U.S.C. § 1401(c); *CMSH Co. v. Carpenters Trust Fund For N. Cal.,* 963 F.2d 238, 239–40 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 185, 121 L.Ed.2d 130 (1992). The arbitrator's conclusions of law are reviewed de novo. *CMSH,* 963 F.2d at 240 (citations omitted).

Although the MPPAA does not provide an explicit standard for reviewing an arbitrator's resolution of mixed questions of law and fact, mixed questions generally are reviewed de novo because they require the court to consider legal concepts and exercise judgment about the values that animate legal principles. *Boone v. United States,* 944 F.2d 1489, 1492 (9th Cir.1991); *see also Rozay's Transfer v. Local Freight Drivers, L. 208,* 850 F.2d 1321, 1331 (9th Cir.1988) (de novo review for mixed questions of fact and law that require court to assess whether legal duties arise under a given set of facts). If, however, the application of the law to the facts requires an inquiry that is "essentially factual," review is for clear error. *Boone,* 944 F.2d at 1492; *see also Chicago Truck Drivers Pension Fund v. L. Zahn Drug,* 890 F.2d 1405, 1411 (7th Cir.1989) (when issue requires fact-finding expertise or the arbitrator's special expertise in the area of pension law, substantial deference is proper).

## DISCUSSION

### I. *Death, Disability and Early Retirement Benefits Were Properly Included in the Withdrawal Liability Assessment*

The MPPAA provides that "nonforfeitable" benefits are considered in the calculation of

**608**

"unfunded vested benefits" for the purposes of determining a withdrawing employer's withdrawal liability. 29 U.S.C. § 1393(c). Nonforfeitable benefits are defined as those:

for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter or Title 26.

29 U.S.C. § 1301(a)(8).

This case raises the question of whether the death, disability and early retirement benefits contained in the plan can be included in the calculation of nonforfeitable, unfunded vested benefits under ERISA. The court is sailing on uncharted waters for there is a veritable dearth of decisional law considering this issue.

■ Before proceeding, the court notes that whether a category of benefits are "nonforfeitable" under section 1301(a)(8) is primarily a question of statutory construction and legislative intent, which does not rest on a factual inquiry. Accordingly, the Arbitrator's legal conclusions concerning the propriety of including death, disability and early retirement benefits in United's withdrawal liability are reviewed de novo.[2]

### A. Death Benefits

■ United argues that death benefits cannot be included in their withdrawal liability because they are not nonforfeitable under section 1301(a)(8). United reads section 1301(a)(8) to mean that, except for death benefits which return mandatory employee contributions, the employee's death is a condition for entitlement to death benefits. The

court disagrees. A plan participant doesn't have to die to be entitled to the type of death benefits at issue in this case. Rather, death is simply the time at which vested benefits are paid out to the beneficiaries of plan participants.

The plain meaning of the term "entitlement" lays bare United's inaccurate reading of the statute. "In its usual sense, to entitle is to give a right, ... to qualify for, [or] to furnish with proper grounds for seeking or claiming." Black's Law Dictionary 626 (4th ed. 1968). Nothing in ERISA suggests that Congress meant to depart from the ordinary definition of "entitlement" when it drafted section 1301(a)(8). Furthermore, the statute expressly provides that a benefit is nonforfeitable when the plan participant has "satisfied the conditions for entitlement *under the plan*...." 29 U.S.C. § 1301(a)(8) (emphasis added). United has already conceded that vested plan participants are "assured some death benefit." Zeldin Dec., Ex. B (United's Post–Hearing Brief) at 2. As the plan states: "Once a person has become a Vested Participant or Pensioner or completes ten Years of Vesting Service, he cannot have a Forfeiture of Service." *Id.* (citing Pension Plan, Effective January 1, 1987, at art. 3).

■ United also relies on a PBGC Opinion Letter which states that death benefits are nonforfeitable under section 1301(a)(8) if "the participant's death occurred *before the date of plan termination.*" Excerpt of Record at 755 (PBGC Op. Ltr. 89–5, Aug. 1, 1989) (emphasis added). Although this court owes deference to the interpretation of ERISA by the PBGC, *Mead v. Tilley*, 490 U.S. 714, 722–27, 109 S.Ct. 2156, 2162–64, 104 L.Ed.2d 796 (1989), the Opinion Letter upon which United relies does not support their argument. The letter refers to forfeitability in the context of the PBGC's effort to limit its liability in cases of plan termination due to a mass withdrawal, *see* 29 U.S.C. § 1399(c)(1)(D), not an employer's withdrawal from a multiemployer pension fund. The

---

2. The Fund's argument that the determination of what benefits are nonforfeitable constitutes a reasonable actuarial assumption warranting deference is not persuasive. It is Congress, not actuaries, who decide which benefits are properly included in withdrawal liability calculations. Though actuarial assumptions and methods are used to determine a plan's unfunded vested benefits, *see* 29 U.S.C. § 1393, such calculations occur within statutorily defined parameters.

determination of which benefits are properly included in an employer's withdrawal liability involves different concerns than the question of which benefits the PBGC will guarantee upon plan termination. The policy behind multiemployer plan withdrawal liability is to ensure the solvency of pension plans, that is, to prevent such plans from terminating. Multiemployer plans do not terminate when an employer withdraws; they remain viable, and all plan participants, including the former employees of the withdrawing employer, may continue to accrue benefits. The PBGC has simply made it clear that in cases where an employer's withdrawal causes a plan to terminate, it will not guarantee the payment of death benefits where the employee has not fulfilled the qualifying condition for payment of the benefits by dying before the plan terminates.[3]

So far as this court can determine, there is only one reported decision on the issue of whether death benefits are nonforfeitable benefits for the purpose of calculating withdrawal liability. In *Huber v. Casablanca Industries, Inc.,* 916 F.2d 85 (3rd Cir.1990), *pet. for cert. filed* (Jan. 9, 1991), the court held that a $2,500 lump-sum post-retirement death benefit provided for by the plan was not nonforfeitable and should therefore not be included in the calculation of unfunded vested benefits. *Id.* at 105. The court based its reasoning on a PBGC regulation which provided that it would not guarantee lump sum death benefits unless "the benefit was substantially derived from a reduction in the pension benefit payable to the participant or surviving beneficiary." *Id.* at 104 (citing 29 C.F.R. § 2613.4(c)). The PBGC regulation is of limited application to the instant case because, as with the Opinion Letter discussed above, the regulation defines what death benefits it will guarantee, not what benefits are properly included in calculating an employer's withdrawal liability.

More importantly, *Huber* is distinguishable because unlike the death benefits under review, the plan's fixed death benefit in *Huber*

was essentially an allowance for funeral costs that had no relationship to an employee's retirement benefit. In other words, the death benefit was not related to the service or age of the participant, or the value of the employee's pension or annuity. The PBGC has stated that those death benefits which are "related to" pension benefits are nonforfeitable. *See* Arbitrator's Decision ("Decision") at 40 (citing Excerpt of Record at 2989 (PBGC Ltr. to Senator Charles E. Grassley, Jan. 24, 1985)); *cf.* 29 C.F.R. § 2613.2 (pension defined as "a benefit payable as an annuity or one or more payments related thereto...."). The rationale for this view is that when death benefits are related to normal pension benefits, the survivor's entitlement to the benefit is derived from the participant's satisfaction of the conditions for entitlement to her pension. *Huber,* 916 F.2d at 103 n. 39 (citing Reply Brief of amicus PBGC at 11); *see also* 29 U.S.C. § 1322(e) (in single-employer plan terminations, preretirement survivor annuities are nonforfeitable and guaranteed by the PBGC regardless of whether the participant has died by the termination date).

According to the Fund's pension plan, a lump sum death benefit in an amount not to exceed $10,000 is payable to the vested participant's surviving spouse or child under 18. If the participant dies before retirement and before the age of 65, the benefit equals 50% of the employer's contribution. If the participant dies before retiring but on or after the normal retirement date, the benefit is 12 times the monthly amount that would have been payable under a "life only pension" if the participant had become a pensioner on the date of his death. If the participant dies after retirement, the benefit is 12 times the monthly amount payable under the "life only pension." *See* Decision at 55–56 (citing Pension Plan, Effective January 1, 1987, at art. 12). Therefore, the death benefits at issue in this case, unlike those in *Huber*, are directly related to pension benefits. That is, the

---

**3.** United's reliance on PBGC Opinion Letter 86–24 also fails to further their cause for it merely states that "ancillary benefits, whether vested or not, should not be taken into account in determining unfunded vested benefits." PBGC Op. Ltr. 86–24, Oct. 31, 1986. The letter does not explain what is meant by "ancillary benefits" or how to distinguish "basic" from "ancillary" benefits.

amount of death benefit an individual receives depends on the applicable retirement benefit which, in turn, is based on the participant's age and years of service with the plan. As the PBGC wrote in its amicus brief in the *Huber* case, death benefits which are "based on the amount of the deceased participant's nonforfeitable pension benefit" are properly included in assessing an employer's withdrawal liability. *See* Excerpt of Record at 2989 (Reply Brief of amicus PBGC at 30 n. 9).[4]

■■■ Also pertinent to the proper resolution of this case is the statutory history and purpose of withdrawal liability. Under the regulatory scheme prior to the MPPAA, an employer who withdrew from a plan more than five years before the plan terminated had no further obligations to fund the liabilities of the plan. Employers who remained with a plan until it terminated, or who withdrew within five years of termination, were liable to the PBGC for unfunded vested benefits, up to 30 percent of the employer's net worth. Because employers who remained in a plan were left "holding the bag" of the plan's unfunded liabilities, the pre-MPPAA regime created an incentive for each employer to withdraw before other contributing employers did so. As the number of participating employers declined, the remaining employers would find it cheaper to terminate the plan than to continue funding it. *See* H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 51, 54, *reprinted in* 1980 U.S.C.C.A.N. 2918, 2922. As the PBGC explained to Congress:

> A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan, so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Pension Plan Termination Issues: Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th Cong., 2d Sess. 22 (1978) (Statement of Mathew H. Lind, PBGC Executive Director).

Congress enacted the MPPAA to arrest this downward spiral. It intended to reduce the incentive for employers to withdraw from multiemployer plans by making it "onerous and costly" for them to do so. *See H.C. Elliott, Inc. v. Carpenters Pension Tr. Fund*, 859 F.2d 808, 810 (9th Cir.1988), *cert. denied*, 490 U.S. 1036, 109 S.Ct. 1934, 104 L.Ed.2d 406 (1989). Since "ERISA did not adequately protect plans from the harm resulting from individual employer withdrawals from multiemployer pension plans," *id.* at 811, the MPPAA requires a withdrawing employer to fund its share of the plan's unfunded liabilities.

It must be kept in mind that ultimately the Fund will have to pay the qualifying participants and survivors covered by this plan. The terms of the plan mandate this. Therefore, holding that the death benefits in this case are properly included in United's withdrawal liability furthers the legislative intent undergirding the MPPAA. Construing unavoidable liabilities resulting from United's participation in the plan as forfeitable so that non-withdrawing employers incur these inevitable costs unless they also withdraw from the plan would clearly defeat the purpose of ensuring the solvency of pension plans by

---

4. There is ample evidence that Congress intended that death benefits which are related to accrued pension benefits should be counted for employer withdrawal liability. The MPPAA "intended that a plan be permitted to base its withdrawal liability determination on the value of vested benefits reported on the Schedule B attached to the plan's annual report." 126 Cong.

Rec. H7901 (1980) (statement of Rep. Ashbrook). Schedule B of the ERISA Annual Report Form 5500 requires that the present value of vested benefits include "the present value of any subsidized early retirement benefits, disability benefits, and death benefits which are related to the accrued benefit." *See* Defendant's Brief at 21 (citing Instructions to Schedule B).

requiring employers pay their share of UVBs upon withdrawal.

■ Compelling policy reasons also support the court's conclusion. Employers do not give benefits to their employees gratuitously. Rather, death benefits, like the other benefits at issue in this case, are the product of collective bargaining and represent both a promise by the employer to fund vested benefits in return for labor, and savings which workers have earned in the form of deferred compensation for their work. This was not lost on the Congress which enacted ERISA: "losses of pension rights are inequitable, since the pension contributions previously made on behalf of the employee may have been made in lieu of additional compensation or some other benefits which he would have received." S.Rep. No. 383, 93d Cong., 2d Sess. 45, *reprinted in* 1974 U.S.C.C.A.N. 4890, 4930.

Finally, it bears keeping in mind that "ERISA ... is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans." *Smith v. CMTA–IAM Pension Trust,* 746 F.2d 587, 589 (9th Cir.1984).

For all these reasons, the court finds that the death benefits at issue in this case are nonforfeitable under section 1301(a)(8). Although death has not occurred and therefore the liability is not currently payable, these benefits will in fact be paid, thereby affecting the fiscal soundness of the plan. Accordingly, the actuarially determined value of the plan's death benefits for vested participants was properly included in the Fund's withdrawal liability calculation.

■ The Arbitrator's one legal error was to hold that death benefits payable to those other than the employee's surviving spouse or dependent children are ancillary and thus should be deducted from the withdrawal liability and paid back. *See* Decision at 56–57; Award at 2. In determining whether a bene-

fit is nonforfeitable it does not matter whom the deceased pensioner or probate law designates to receive the death benefit. Whether the beneficiary is a surviving spouse, a "significant other," or the deceased's estate, the death benefits at issue are related to pension benefits and constitute a liability which the Fund must pay. Accordingly, the Arbitrator's decision to exclude from the withdrawal liability assessment death benefits payable to those other than the deceased pensioner's surviving spouse or dependent children is vacated and the Fund's assessment of United's withdrawal liability is reinstated in its entirety.

**B. Disability and Early Retirement Benefits**

■ According to the MPPAA's legislative history, disability and early retirement benefits in the plan are nonforfeitable under section 1301(a)(8) and thus were properly included in the Fund's assessment of United's withdrawal liability. The House Report accompanying the legislation that became the MPPAA statute states that for the purposes of determining withdrawal liability, "the term unfunded benefit obligations is intended to mean the unfunded liability for vested benefits (including early retirement benefits, Social Security supplements, and disability benefits)." H.R.Rep. No. 869, Part I, 96th Cong., 2d Sess. 51, 77–78, *reprinted in* 1980 U.S.C.C.A.N. 2918, 2945–46; *see also* H.R.Rep. No. 869, Part II, 96th Cong., 2d Sess. 1, 21 n. 4, *reprinted in* 1980 U.S.C.C.A.N. 2993, 3011 (noting that "unfunded benefit obligations" are the plan's unfunded liability for benefits for which participants have met service requirements, "including early retirement subsidies, Social Security supplements, and vested accrued benefits.")

■ Disability benefits, like death benefits, represent potential liabilities for which the Fund's actuaries must account.[5] An em-

---

**5.** Whether or not disability benefits are included in United's withdrawal liability is of little consequence. At the arbitration hearing the Fund pointed out that including disability benefits lowered the amount of unfunded vested benefits because the pension fund has less potential liabil-

ity if some employees become disabled and live shorter lives. The Fund argued that by ignoring persons who are expected to become disabled, United's expert failed to recognize that such persons are entitled to normal retirement benefits, at a potentially greater cost to the Fund if they

ployee doesn't have to be disabled, any more than she has to die, to have "satisfied the conditions for entitlement under the plan." 29 U.S.C. § 1301(a)(8). The fact that a dis-·ability has not occurred at the time of vesting, and therefore the liability is not currently payable, does not forfeit the employee's entitlement to a disability benefit which has been earned on the basis of service to the employer as set forth in the plan. As the district court commented in *In re Gulf Pension Litigation,* 764 F.Supp. 1149 (S.D.Tex. 1991): "while 'accrued benefits' do not normally encompass ancillary benefits such as disability benefits ..., a pension plan *may* provide such ancillary benefits, and when it does, they must be taken into account in funding the plan." *Id.* at 1176 n. 33 (citations omitted).

United's reliance on *Music v. Western Conference of Teamsters, etc.,* 660 F.2d 400 (9th Cir.1981), *vacated and remanded on other grounds,* 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982), *on reh'g,* 712 F.2d 413 (9th Cir.1982), is misplaced because the case says nothing about withdrawal liability. According to the pension plan under review in *Music,* a disabled employee had to be eligible to receive federal disability benefits before receiving a union disability pension. Because the federal disability insurance program requires a waiting period of five months between the date an applicant becomes disabled and the date she is eligible to receive benefits, 42 U.S.C. § 423(c)(2), the fund fixed the amount of disability benefits by the terms of the pension plan in effect five months after the disabling event. Mr. Music maintained

that his eligibility for disability benefits commenced on the date he became disabled, and that the amount of his disability benefits should be calculated under the more generous terms of the pension plan in force at that time. The Ninth Circuit agreed, reasoning that an employee's right to disability benefits vests at the time of the disabling event, *id.* at 404, and the pension fund had no reasonable justification for requiring a five month waiting period. *Id.* at 405. Although *Music* limits the power of plan trustees to fashion eligibility requirements for disability benefits, it is not an employer withdrawal liability case, nor does it state whether disability benefits are properly included in a plan's calculation of nonforfeitable, vested benefits.[6]

▮ As for early retirement benefits, United claims that because such benefits are not "accrued" according to 29 U.S.C. § 1002(23), they cannot be nonforfeitable.[7] Even if United is correct that early retirement benefits are not themselves accrued, but only "treated as" accrued under 29 U.S.C. § 1054(g) to immunize them from plan amendment, their argument is irrelevant. For the purposes of determining an employer's withdrawal liability, it is of no moment whether a benefit is accrued. Section 1301(a)(8) plainly states that a benefit is nonforfeitable when the employee has satisfied the plan's conditions for entitlement, *"whether or not the benefit may subsequently be reduced or suspended by a plan amendment."* 29 U.S.C. § 1301(a)(8) (emphasis added).[8]

do not become disabled than if they do. The Arbitrator accepted the Fund's analysis, *see* Decision at 58, and United has failed to rebut this finding by a clear preponderance of the evidence as required under 29 U.S.C. § 1401(c).

6. United's reliance on PBGC regulations is also unavailing. Like the regulations and opinion letters pertaining to death benefits, the regulations relied upon by United contemplate plan termination, not withdrawal liability. *See, e.g.,* 29 C.F.R. § 2619 (addressing the valuation of plan benefits for single-employer plan in Title IV terminations); *id.* § 2676.12(a)(1)–(3) (for mass withdrawal benefit valuations, only benefits in pay status are considered).

7. Under ERISA accrued benefits are "expressed in the form of an annual benefit commencing at

normal retirement age." 29 U.S.C. § 1002(23); *see also* Treas.Reg. § 1.411(a)–7(a)(1) (excluding early retirement benefits from definition of "accrued benefits").

8. For this reason, *Hickey v. Chicago Truck Drivers Union,* 980 F.2d 465 (7th Cir.1992), which United submitted to the court after the hearing in this matter, is not applicable. United is apparently relying on *Hickey* for the proposition that according to legislative history, early retirement benefits are not accrued benefits under ERISA. As the court has explained, § 1301(a)(8) does not require that benefits must be accrued to be included in a plan's withdrawal liability calculation.

An employee is entitled to early retirement benefits if she has satisfied all the relevant conditions and need only apply for the benefit. Section 1301(a)(8) specifies that an employee does not have to submit an application or retire to satisfy the conditions of entitlement under ERISA. The Arbitrator found that the Fund's actuary only counted early retirement benefits for employees who had already satisfied the age and service requirements by the time of the valuation date and were thus eligible to retire early. The court finds no reason to disturb this finding.

In sum, disability benefits and early retirement benefits, like death benefits, are real liabilities of the Fund.[9] Unless the Fund accumulates the money necessary to pay for these benefits from withdrawing employers, the cost will be absorbed by non-withdrawing employers or the PBGC. As discussed above, the expressed purpose of the MPPAA is to prevent this from happening. In order to effectuate the legislative intent of protecting vested benefits and bolstering pension plan solvency, the court determines that disability and early retirement benefits were properly included in United's assessment of the Fund's withdrawal liability.

## II. *The Arbitrator Properly Ruled That the Fund's Actuarial Assumptions Were Reasonable*

▮ The Arbitrator ruled that the "actuarial assumptions and methods used by the Fund to compute unfunded vested benefits are not found to be unreasonable in the aggregate nor clearly erroneous...." Award at 2. The Fund is entitled to a presumption, "rebuttable only by a clear pre-

ponderance of the evidence," that the Arbitrator's findings of fact are correct. 29 U.S.C. § 1401(c).[10]

▮ Specifically, United argues that the Fund's use of a two percent sample of the participant population as well as the actuarial assumptions based on that sample were unreasonable. The Arbitrator disagreed and there is no reason to upset his conclusion. The Fund has several thousand contributing employer accounts and over 1.5 million plan participants. Though the Fund has complete data on retirees, it lacks all the information needed for making actuarial valuations for non-retired employees. Therefore, the Fund's actuary used a two percent sample to estimate the amount of unfunded vested benefits. *See* 29 U.S.C. § 1393(b)(2) (an actuary may "rely on the data available or on data secured by sampling which can reasonably be expected to be representative of the status of the entire plan."). To validate the accuracy of the statistical sample, the Fund's actuaries took a two percent sample of retired participants and projected from this sample the liability attributable to all retired participants. The results were then compared with the total retiree population, for which the Fund had accurate data. The liabilities calculated by use of the sample were 99% of the liabilities determined by use of the complete data. The Arbitrator found this to be a strong indication that the two percent sample used for the entire participant population was unbiased and reasonable. The court agrees.[11]

Nor has United met its burden regarding the interest assumptions used by the Fund's

9. For instance, the IRS requires a pension plan to take the possibility of early retirement into account in deriving reasonable actuarial assumptions. Rev.R. 78–331, 1978–2 C.B. 158; *Internal Revenue Service Manual, Actuarial Guidelines Handbook*, reprinted in 1 Pension Plan Guide CCH ¶ 3565, ch. 520 (1986).

10. The Arbitrator also has the discretion to refuse to hear evidence that is cumulative or irrelevant. *See* Fed.R.Evid. 103(a)(2), 402, & 403; *Hoteles Condado Beach Etc. v. Union De Etc.*, 763 F.2d 34, 39 (1st Cir.1985) (arbitrator's award vacated only if refusal to hear evidence prejudices the rights of one of the parties). The court

finds that the Arbitrator did not abuse his discretion by excluding Mr. Griffin's testimony. Mr. Griffin was a CPA, not an actuary; he admitted that he was not qualified to opine on whether the Fund's actuarial assumptions were reasonable, and United's actuarial witness, Mr. Harrold, testified at some length about the actuarial assumptions which United claims Mr. Griffin would also have presented.

11. United's reliance on *Matter of Arbitration Between Carnation Co., Inc., and Central States Pension Fund*, 9 Empl.Ben.Cas. (BNA) 1409, 1436 (1988) is misplaced. That case involved a one percent sample and unlike the instant case, there was testimony at the hearing that a larger sample

actuaries. As the Arbitrator noted, the reasonableness of the Fund's 8.9% interest assumption was underscored by United's own expert who conceded that such a rate was reasonable for funding purposes. Decision at 94–95.

■ Finally, United contends that the Arbitrator should not have granted a presumption of correctness to the Fund's calculation of withdrawal liability because the Fund's trustees failed to satisfy their fiduciary duties under ERISA. The gist of this argument is that the trustees did not personally perform the duties mandated by ERISA regarding withdrawal liability determinations, and they did not review or ratify other's determinations. The Arbitrator held that it was proper for the trustees to delegate the task of calculating withdrawal liability once the Plan's actuaries made the requisite actuarial assumptions. Decision at 23–25.

The grounds for United's argument are unclear for trustees owe fiduciary duties solely to the participants and beneficiaries of the pension plan, not to employers. 29 U.S.C. § 1104(a)(1); *N.L.R.B. v. Amax Coal Co.*, 453 U.S. 322, 328–34, 101 S.Ct. 2789, 2793–97, 69 L.Ed.2d 672 (1980). However, even if the trustees owed fiduciary duties to United, they have satisfied their statutory obligations. The Fund simply delegated to Northwest Administrators the ministerial task of compiling and maintaining various records and data for use by the Plan's actuary in determining the Fund's unfunded vested benefit liability. Decision at 25. It was not a breach of trust as it did not involve important discretionary functions. Once the actuary made the requisite determinations, Northwest Administrators calculated United's liability. Again, this was a non-discretionary, ministerial task. The trustees determined the Fund's general method of calculating withdrawing employer's liability, *see* Decision at 26 (citing Supplement to Pension Plan at 19), but "the calculation need not be theirs since it is a mathematical procedure performed in accord with the statute by the actuary." *Buy–Low of Cassopolis, Inc. and*

*Trustees, Food Workers Pension Fund,* 5 Empl. Ben. Cas. (BNA) 2641, 2646 (1984).

### III. *Attorneys Fees and Costs*

■ At the conclusion of the arbitration hearing United requested an award of attorneys' fees of $431,323.25 and expenditures of $112,642.34, for a total of $543,965.59. The Fund requested $271,441.49 in attorneys' fees, $50,435.28 in expenditures, and $190,498.67 in witness fees for a total of 512,375.44. Pursuant to 29 U.S.C. § 1401(a)(2), the Arbitrator awarded the Fund what it considered to be an "equitable amount" of fees and expenses to be paid to it by United: $135,720 in attorneys' fees, $25,218 in legal expenses, and $95,254 in witness fees for a total of $256,192.00. *See* Decision at 97–98; Award at 2.

United argues that the Arbitrator abused his discretion and the award should be vacated and that United should be awarded its costs and fees related to the arbitration. The Fund seeks the fees and costs it incurred in this action.

After reviewing the Arbitrator's decision, the court finds that the Arbitrator's award was not an abuse of discretion. The Arbitrator noted that due to the informal nature of arbitral proceedings, fee awards are uncommon. Decision at 95. However, the Arbitrator found that United "misconstrued" the nature and purpose of the arbitration by initiating "extensive discovery," failing to adequately state the nature of the dispute in the early parts of the hearing, and ultimately spending over a half a million dollars in fees and costs in a case involving withdrawal liability of one million dollars.[12] *Id.* at 96–97. Concerned that the Plan's beneficiaries and non-withdrawing employer's should not have to pay for all the Fund's legal expenses, the Arbitrator awarded the Fund approximately half the fees and costs it requested. This was a proper exercise of the Arbitrator's discretion.

■ The Fund argues that as the prevailing party in an action under 29 U.S.C. § 1132(g)(2), an award of attorneys' fees is

---

would reduce the employer's withdrawal liability.

**12.** In fact, the combined expenditures of both parties during the arbitral proceedings comes to

roughly $1,056,340, just $10,000 less than the $1,066,025 in dispute.

mandatory. The Fund is clearly mistaken for section 1132(g)(2) only governs actions to collect delinquent withdrawal liability.[13] *Trustees of Amalgamated Ins. Fund v. Geltman Industries,* 784 F.2d 926, 931–32 (9th Cir.), *cert. denied,* 479 U.S. 822, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986) (citing cases). It is uncontroverted that the Fund has already collected the full liability assessment from United. The Fund brought case number C–92–2748 MHP to modify .the Arbitrator's award. United brought case number C–92–2725 MHP seeking to vacate the Arbitrator's award and receive a refund because of allegedly erroneous legal conclusions. Delinquent contributions have never been an issue in this consolidated cross-action, nor did the Fund mention 29 U.S.C. § 1145 ("Delinquent Contributions") in its Complaint. Accordingly, the Fund's request is denied.

CONCLUSION

For the forgoing reasons, defendant's motion for summary judgment is GRANTED and plaintiff's motion for summary judgment is DENIED. Defendant's request for attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(2) is DENIED.

IT IS SO ORDERED.

---

**13.** Section 1132(g)(2) provides:
 In an action under this subchapter ... to enforce section 1145 [pertaining to delinquent contributions] in which a judgment in favor of the plan is awarded, the court shall award the plan—
 &ast; &ast; &ast; &ast; &ast; &ast;
 (D) reasonable attorneys' fees and costs of the action, to be paid by the defendant....

29 U.S.C. § 1132(g)(2).