982 F.2d 857
 CROWN CORK & SEAL COMPANY, INC.
v.
CENTRAL STATES SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, a
Federal multiemployer employee pension benefit plan; Loran
W. Robbins; Marion M. Winstead; Robert C. Sansone; Robert
J. Baker; Howard McDougall; Arthur H. Bunte; R. Jerry
Cook and R.V. Pulliam, its present trustees in their
fiduciary capacity(ies) (D.C. Civil No. 84-05737).
Central States, Southeast and Southwest Areas Pension Fund,
a pension trust; Marion M. Winstead; Robert C. Sansone;
Robert J. Baker; Howard McDougall; Arthur H. Bunte, Jr.;
R. Jerry Cook; R.V. Pulliam, Sr.; Harold D. Leu, its present trustees
v.
CROWN CORK & SEAL COMPANY, INC. (D.C. Civil No. 91-04423),
Central States, Southeast and Southwest Areas Pension Fund,
a pension trust, and its trustees, including Marion M.
Winstead, Robert C. Sansone, Robert J. Baker, Howard
McDougall, Arthur H. Bunte, Jr., R. Jerry Cook, R.V.
Pulliam, Sr. and Harold D. Leu, Appellants.
 No. 92-1345.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 16, 1992.
Decided Dec. 23, 1992.
Sur Petition for Rehearing Jan. 19, 1993.
 
 Steven B. Feirson, (argued), Alan D. Berkowitz, Laura Aldir-Hernandez, Dechert, Price & Rhoads, Philadelphia, PA, for appellee.
 Thomas C. Nyhan, Terrence G. Craig (argued), Neal S. Deodhar, Central States Law Dept., Rosemont, IL, for appellants.
 Before: MANSMANN, HUTCHINSON and GARTH, Circuit Judges.
 MANSMANN, Circuit Judge.
 
 
 1
 Crown Cork & Seal Company, Inc., sought to obviate, under the Deficit Reduction Act of 1984 ("DEFRA"), its withdrawal liability to its multiemployer pension plan when it ceased production at its St. Louis Plant in 1980. In order to seek the benefits of DEFRA, the company must show that (1) it had a binding agreement to withdraw from a multiemployer plan as of September 26, 1980 and (2) that it effectuated a complete withdrawal from the plan by December 31, 1980.
 
 
 2
 In this appeal we must interpret the term, a "binding agreement to withdraw," within the meaning of Section 558(d) of DEFRA and must determine whether a cessation of virtually all covered operations satisfies the complete withdrawal requirement of § 1383(a)(2) of the Multiemployer Pension Plan Amendments Act ("MPPAA") to ERISA.
 
 
 3
 We hold that an employer's actions committing it to withdraw from a multiemployer pension plan by announcing its plant closing, bargaining with its unions over the effects of that closing and signing a listing agreement placing its plant for sale satisfy the language and statutory purpose of DEFRA's requirement of a "binding agreement to withdraw." We further hold that an employer has completely withdrawn when it ceases its normal business operations in preparation for a shutdown. Accordingly, we will affirm the judgment of the district court exempting Crown Cork from withdrawal liability in closing its St. Louis Plant.
 
 I.
 
 4
 In 1980, economic conditions and decreased demand for three piece cans convinced Crown Cork to close its St. Louis can manufacturing plant. On July 28, 1980, Harold Abrams, Crown Cork's Director of Industrial Relations, sent a letter to each of the four unions that represented employees at the St. Louis plant, informing them that the company had made a final decision to close the plant. In those letters Abrams stated that Crown Cork "expected that the closing [would] occur by the end of September, 1980."
 
 
 5
 Production and maintenance employees, as well as some clerical employees, were represented by Local 688 of the International Brotherhood of Teamsters (Local 688).[1] On July 31, 1980, Local 688's business representative, Ken DeGrande, sent a letter acknowledging receipt of Abrams' letter "regarding the closing of the St. Louis plant" and requesting that Abrams meet with him "as rapidly as possible to negotiate the effects of the closing." On August 13, 1980 and several occasions thereafter, Abrams met with DeGrande to negotiate the effects of the closing, including severance pay, vacation pay and related matters. Local 688 did not, however, challenge the company's decision to close the plant.
 
 
 6
 Crown Cork proceeded to implement its decision by a massive reduction in its work force. As a result of layoffs, terminations and transfers, only 9 of Crown Cork's 29 management employees remained at the St. Louis Plant after September 26th; 44 of the 148 production and maintenance workers remained; of 12 clerical workers, only 4 remained.
 
 
 7
 On September 16, 1980, Crown Cork's Director of Production Control, Donald Kirkpatrick, issued an internal mailgram to managers notifying them that the St. Louis plant would close at the end of business on September 26, 1980, and that all orders placed at the St. Louis plant should be switched to another point of manufacturing before then. After this date, there was no new can production at the St. Louis plant. Finish-up work consisting of assembling remaining materials into cans amounting to a total of 265 production line-hours was performed in October. This "finish up" work was completed by October 10, 1980; thereafter, the only work performed at the St. Louis plant consisted of tasks incidental to the final closing of the plant: dismantling, maintenance, clean-up and disposal of equipment and property.
 
 
 8
 On September 23, 1980, Crown Cork entered into a listing agreement with Turley Martin, a real estate broker, to sell the plant. The St. Louis plant was ultimately sold on June 3, 1982.
 
 
 9
 Additional layoffs and terminations followed and by December 31, 1980, only three members of Local 688's production and maintenance unit and only one member of Local 688's clerical unit were still employed at the St. Louis Plant, performing shut down work. Crown Cork's last production and maintenance employee was placed on layoff on November 6, 1981. From October, 1980 through November, 1981 Crown Cork continued to submit employee work history reports for these few remaining employees and continued to contribute to the Pension Fund on their behalf.
 
 
 10
 In a letter dated October 26, 1983, pursuant to 29 U.S.C. § 1399(b)(1), the Pension Fund sent Crown Cork a notice and demand for the payment of withdrawal liability in the amount of $31,802.75 monthly, beginning January 1, 1984 or alternatively as a lump sum amount of $1,319,859.30 (based upon a withdrawal date of November 28, 1981). On December 20, 1983 the Pension Fund sent Crown Cork a "past due" notice. Subsequently, on December 30, 1983, Crown Cork requested that the Pension Fund review its withdrawal liability determination in accordance with 29 U.S.C. § 1399(b)(2)(A). On March 23, 1984, pursuant to 29 U.S.C. § 1399(b)(2)(B), the Pension Fund responded to Crown Cork's review request.
 
 
 11
 In November, 1984, after exhausting review with the Pension Fund, Crown Cork filed suit in the United States District Court for the Eastern District of Pennsylvania, seeking a declaration that it did not owe the Pension Fund withdrawal liability because it was exempt from such liability under DEFRA. On December 30, 1988, the district court granted summary judgment in Crown Cork's favor based upon its DEFRA defense. The district court found that Crown Cork had a "binding agreement to withdraw" in effect before September 26, 1980, and had accomplished a complete withdrawal by December 31, 1980. The Pension Fund appealed.
 
 
 12
 On July 14, 1989, we held that Crown Cork's DEFRA claim should be submitted to arbitration before being subject to judicial review. Accordingly, we reversed the order granting Crown Cork summary judgment and remanded the case to the district court for entry of an order to "defer the matter to arbitration" pursuant to 29 U.S.C. § 1401(a)(1) (1982). Crown Cork & Seal Co. Inc. v. Central States Southeast and Southwest Areas Pension Fund, 881 F.2d 11, 19-20 (3d Cir.1989) ("Crown Cork I").
 
 
 13
 After some procedural maneuvering,[2] the case was ultimately submitted to arbitration on the basis of a stipulated record. Arbitrator James Clair Duff issued an Opinion and Award on January 15, 1991 in which he rejected Crown Cork's DEFRA defense and found, instead, in favor of the Pension Fund. Arbitrator Duff retained jurisdiction to determine any amounts due and owing, issuing his final award on June 7, 1991 in which he assessed Crown Cork $2,072,247.08 in withdrawal liability.[3]
 
 
 14
 Subsequently, Crown Cork filed a motion to vacate the arbitration award. The Pension Fund responded with a motion for summary judgment to enforce the award. On March 30, 1992, the district court granted Crown Cork's motion to vacate the arbitration award, holding that Crown Cork was exempt from withdrawal liability because it had met DEFRA's requirements.
 
 
 15
 The district court had jurisdiction under 29 U.S.C. § 1401(b)(2)(1988) (any party to an arbitration proceeding can request judicial review no later than thirty days after issuance of an arbitrator's award in appropriate federal district court). In such cases, the district court presumes that the arbitrator's factual findings are correct unless they are rebutted by a clear preponderance of the evidence. 29 U.S.C. § 1401(c); Huber v. Casablanca Industries, 916 F.2d 85, 89 (3d Cir.1990), petition for cert. filed (Jan. 9, 1991). The arbitrator's legal conclusions are reviewed de novo. Id.
 
 
 16
 We have jurisdiction over appeals from final judgments of district courts pursuant to 28 U.S.C. § 1291. In Crown Cork I, we characterized the questions of whether Crown Cork had a binding agreement to withdraw and whether covered operations at the St. Louis plant had permanently ceased as mixed questions of law and fact. Crown Cork I, 881 F.2d at 18 n. 19. In reviewing mixed questions such as these, we apply a clearly erroneous standard to findings of fact and conduct plenary review of conclusions of law, applying the appropriate standard to each component. In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir.1989).
 
 II.
 
 17
 Multiemployer pension plans such as the Pension Fund are subject to the provisions of the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001 et seq. (1974). ERISA's central purpose is to protect the security of employee pension plans and to insure that benefits which have vested are paid to employees. Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).
 
 
 18
 Under ERISA, an employer who withdrew from a multiemployer pension plan could be liable in some circumstances for a share of the unfunded portion of vested benefits in the plan. 29 U.S.C. §§ 1363-64. ERISA provided, however, that if the pension plan survived for five years after an employer withdrew, the employer would not be liable for any unfunded benefits should the plan fail sometime after five years. 29 U.S.C. §§ 1363(c) (1982). Acting at least partly out of a concern that many employers were withdrawing from multiemployer plans on the gamble that the plan would survive for five years after their departure, and to ensure that the plans had sufficient funds to pay benefits which had already vested, Congress enacted the Multiemployer Pension Plan Amendments Act, 29 U.S.C. § 1381 et seq. Central States, Southeast & Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760 (6th Cir.1987) (citing H.R.Rep. No. 96-869, 96th Cong., 2d Sess. 52-57 (1980), reprinted in 1980 U.S. Code Cong. & Admin. News 2918, 2920-25).
 
 
 19
 Under the MPPAA, an employer who withdraws from a multiemployer pension plan becomes obligated to pay a proportionate share of the plan's unfunded vested benefits. This debt is known as withdrawal liability. Although MPPAA was enacted on September 26, 1980, Congress gave the statute retroactive effect in order to "prevent employers from taking advantage of a lengthy legislative process and withdrawing while Congress debated necessary revisions in the statute." Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 723, 104 S.Ct. 2709, 2714, 81 L.Ed.2d 601 (1984).
 
 
 20
 The U.S. Supreme Court held MPPAA's retroactive provision constitutional. Pension Benefit Guaranty Corp. v. R.A. Gray & Co., supra. One month later, however, Congress passed the Deficit Reduction Act of 1984, which included a provision that amended MPPAA's effective date. Congress' reasons for legislatively eliminating MPPAA's retroactive effect were twofold. The Senate Finance Committee found that the retroactive application of MPPAA had an unduly burdensome effect on employers that withdrew between April and September, 1980 and was unnecessary to preserve the financial integrity of multiemployer plans. Long Island Oil Products Co. v. Local 553 Pension Fund, 775 F.2d 24, 27 (2d Cir.1985).
 
 
 21
 Section 558 of DEFRA, entitled "Elimination of Retroactive Application of Amendments Made by Multiemployer Pension Plan Amendments Act of 1980," provides in section (a)(1) that any withdrawal liability incurred by an employer as a result of a partial or complete withdrawal before September 26, 1980 is void. For those employers who have not completely withdrawn by September 26, 1980, DEFRA contains a special provision for transactions in which a binding agreement to withdraw from a multiemployer plan was entered into before September 26, 1980, giving employers until December 31, 1980 to effectuate a complete withdrawal.[4] See Section 558(d).
 
 III.
 
 22
 Application of DEFRA to the facts of this case raises two questions. First, did Crown Cork have a binding agreement to withdraw by September 26, 1980? If so, did a complete withdrawal occur before the end of 1980?[5]
 
 A.
 
 23
 The district court found that Crown Cork's notice to its union of plant closing and subsequent "effects" bargaining along with its real estate listing agreement met the language and statutory purpose of DEFRA and thus concluded that Crown Cork had a binding agreement to withdraw before September 26, 1980. In so finding, the district court held that the true purpose behind § 558(d) of DEFRA is to allow exemptions from withdrawal liability to those employers, who, in good faith, effectively and irrevocably were committed to withdrawing from a multiemployer pension plan before September 26, 1980.
 
 
 24
 Interpreting the meaning of DEFRA's requirement of a "binding agreement to withdraw" is not an easy task. DEFRA does not contain a definition of a "binding agreement to withdraw" and the legislative history of this provision is scant. The only reference in the legislative history to what might qualify is a reference made to a binding sale[s] agreement.[6]
 
 
 25
 In the few cases which have come before the courts, the meaning of "binding agreement to withdraw" has been construed narrowly. For example, the statute was deemed satisfied where an executed agreement of sale existed prior to September 26. Central States, Southeast & Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760 (6th Cir.1987). See also Debrecent v. Outlet Company, 784 F.2d 13, 17 (1st Cir.1988) (agreement of sale dated before, but executed after, September 26, 1980 did not constitute a binding agreement as to that date and thus did not satisfy DEFRA); Salem Laundry Co. v. New England Teamsters and Trucking Industry Pension Fund, 829 F.2d 278 (1st Cir.1987) (conduct of the parties through negotiations supported an inference that they did not intend to be bound until a formal contract [of sale] was executed).
 
 
 26
 Here, the district court found that a literal reading of "binding agreement to withdraw from a multiemployer plan" would create an ambiguity because an employer cannot "agree" to withdraw from a plan. "Rather, the employer may take definitive action, such as discontinuing operations, which results in withdrawal." Opinion at p. 863. Therefore, the district court held that a more expansive reading of the language was required.
 
 
 27
 We agree with the district court that this phrase is ambiguous.[7] Any attempt to interpret literally the language of this phrase raises several questions about the nature of the agreement itself: Who would be the parties to a binding agreement to withdraw? A union? A pension fund? What provisions would underlie such an agreement?
 
 
 28
 The Pension Fund asserts that an employer and a union could enter into an agreement which provides that on a certain date an employer's contributions to a multiemployer pension plan would cease and cites Robbins v. Lady Baltimore Foods, 868 F.2d 258 (7th Cir.1989). There, DEFRA's "binding agreement to withdraw" requirement was satisfied by a provision in the parties' collective bargaining agreement which called for the cessation of contributions to the pension fund on a specified date. That such an agreement actually existed in Lady Baltimore Foods does not convince us that this is the only type of agreement that satisfies DEFRA and "binds" an employer into withdrawing from a multiemployer pension plan. We do not believe that Congress intended to limit DEFRA's application to those situations in which an employer's withdrawal was foreseeable and the employer had executed an agreement with its union in advance of the situation. Economic reality indicates that, in many situations, an employer may not anticipate having to close its business, with the consequence of withdrawing from a multiemployer pension plan. Moreover, we do not believe that Congress intended to limit DEFRA's application to those situations in which a union, or any other party, had consented to the employer's withdrawal from a plan. Thus "consent", by either a union or a pension fund, is not required as a condition precedent to an employer's prerogative to make a business decision simply because that decision results in the employer's withdrawal from a multiemployer pension plan.
 
 
 29
 We thus turn to Congress' intent in enacting DEFRA. In enacting DEFRA, Congress had concluded that MPPAA's retroactive effective date was unduly harsh because it imposed significant unexpected liability on employers who withdrew before the statute was enacted. Moreover, it was discovered that retroactive application of MPPAA was unnecessary to preserve the financial integrity of the plans.[8] In enacting DEFRA, Congress singled out a group of employers it believed was treated unfairly under MPPAA. We believe that Congress, in requiring some type of "binding agreement to withdraw," intended to exclude from withdrawal liability those employers whose actions effectively and irrevocably committed them to withdrawing from a multiemployer pension plan before September 26, 1980.
 
 
 30
 Crown Cork's actions prior to September 26, 1980, to accomplish this objective are undisputed. Its announcement of its plant closing occurred in July. Immediately thereafter Crown Cork's unions were notified, negotiations over the effects of the closing were held, massive layoffs and transfers occurred, and work already in progress was "finished up" in preparation for a complete shutdown. In sum, a total liquidation was in progress. These actions carried with them legally binding obligations and ramifications, such as Crown's duty to bargain over the effects of its closing with its unions. First National Maintenance Corp. v. NLRB, 452 U.S. 666, 676 n. 15, 101 S.Ct. 2573, 2579 n. 15, 69 L.Ed.2d 318 (1981).
 
 
 31
 In addition to these commitments Crown Cork had entered into a listing agreement with Turley Martin, a real estate broker, obligating Crown Cork to sell the plant if the broker produced a ready, willing and able buyer. If Crown Cork did not go through with the sale, it would suffer substantial financial penalties. These actions "bound" Crown Cork to withdraw as effectively as any contractual agreements.
 
 
 32
 We cannot ignore the economic reality that factory facilities are not readily sold. Most commercial or business transactions are not simple, one-step transfers, but multi-step arrangements beginning with an agreement and ending with a final closing, often many months later. Central States, Southeast & Southwest Areas Pension Fund v. 888 Corp., 813 F.2d 760, 765 (6th Cir.1987). In this case, Crown Cork's listing agreement with Turley Martin resulted in an agreement of sale executed on June 3, 1982, close to two years after Crown Cork's decision to sell the plant and terminate operations. We see no reason to distinguish between those employers who, through good fortune or favorable market conditions, were able to conclude their business through a sale to a ready, willing and able buyer, and those who had made an economic decision to close their business and had taken concrete steps to accomplish this objective but were unable to secure a ready buyer.
 
 B.
 
 33
 Having concluded that Crown Cork satisfies DEFRA's first requirement, we turn now to the issue of whether a complete withdrawal occurred before December 31, 1980. Under the MPPAA, a complete withdrawal occurs in one of two separate and distinct ways, when an employer either: "permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a)(2). The first test focuses on the employer's contribution of funds to a multiemployer pension plan. The second test defines withdrawal based on the status of an employer's "covered operations." Admittedly Crown Cork does not meet the contributions test for withdrawal because Crown Cork continued to make contributions to the Pension Fund until November, 1981. The date of a complete withdrawal is defined as "the date of the cessation of the obligation to contribute or the cessation of covered operations." 29 U.S.C. § 1383(e).
 
 
 34
 The district court found that, for all practical purposes, Crown Cork had suspended its operations by December 31, 1980, thus effecting a complete withdrawal. The district court accepted these undisputed facts: Crown Cork had terminated or transferred most of its employees before the end of September, 1980; those employees who remained at the plant were engaged in "finishing up" work of a de minimis nature; production line-hours in October, 1980 totalled 265 line-hours, representing roughly 5% of a typical pre-closure monthly total of 4,419 line hours; as of September 26, 1980 no new orders were processed at the St. Louis plant; after October 10, 1980 all production activity ceased and the only remaining activities at the plant consisted of tasks incidental to closing; after December 31, 1980 the only employees remaining at the plant were three production and maintenance workers, one clerical worker and four management employees.
 
 
 35
 In its appeal, the Pension Fund argues that Crown Cork did not completely withdraw from the Pension Fund until November 6, 1981, when its last production and maintenance employee was laid off and it ceased making any contributions on behalf of this employee to the Pension Fund.[9] The Pension Fund relies on the decision of the United States Court of Appeals for the Seventh Circuit that a complete withdrawal does not occur until all, that is, one hundred percent of an employer's covered operations, cease. In Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp., 872 F.2d 208 (7th Cir.), cert. denied, 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989), the Court of Appeals held that § 1383(a)(2)'s clear and unambiguous language required that all (100%) of the covered operations must permanently cease before an employer has completely withdrawn from a plan. The court reversed the decision of the district court which held it sufficient if "virtually all" covered operations came to a halt. 872 F.2d at 212. The Court of Appeals interpreted "covered operations" under ERISA as referring to those operations covered by the collective bargaining agreement for which the employer must contribute to the pension plan. 872 F.2d at 214 n. 10. The issue was characterized as "whether bargaining unit work is being performed for which contributions are being made," not simply whether production work is being performed.[10]
 
 
 36
 We are influenced again by the legislative history of these statutes. In the Report of the House Committee on Education and Labor discussing MPPAA's section 1383(a)(2), the following statement is instructive:
 
 
 37
 It is intended, however, that a complete withdrawal occurs as under current law, where an employer has ceased virtually all operations at the facility for which the employer makes contributions to the plan.
 
 
 38
 H.Rep. No. 96-869, Pt. I, 96th Cong., 2d Sess. 68, reprinted in 1980 U.S.C.C.A.N. at 2936 (emphasis added). In addition, a report drafted by the Senate's Labor and Human Resources Committee, discussing the requirement that a cessation of operations be permanent, indicates that when Congress used the term "operations" it meant normal business activity:
 
 
 39
 The committee intends that covered operations be treated as having permanently ceased when business activity substantially ceases or when it continues but no longer gives rise to contributions to the plan.
 
 
 40
 S.Rep. 1076, 96th Cong., 2d Sess. at 12, 13. And from the Report of the House Committee on Education and Labor discussing MPPAA:
 
 
 41
 Current law does not define a withdrawal. As under current law, a virtually complete cessation of contributions, e.g., a 98 percent reduction, that has the same effect on the plan as a complete cessation of contributions is a complete withdrawal.
 
 
 42
 H.R.Rep. No. 96-869, Pt. I, 96th Cong., 2d Sess. 73, reprinted in 1980 U.S.C.C.A.N. 2918, 2941.
 
 
 43
 We find that the statutory language "all covered operations" is not sufficiently clear and free from ambiguity as to stand on its own. Resort to legislative history is thus mandated. Indeed, we find that two of the terms contained in that phrase, specifically "covered" and "operations," cannot be defined without resort to it. Our examination of the legislative history leads us to conclude that substantial cessation of normal business activity meets the complete withdrawal standard.
 
 
 44
 We also join those district courts which have focused on the type of work in which the employer was normally engaged--its true operations. Where it was clear that an employer had ceased its normal business operations in preparation for a shut down, these courts have held that the performance of non-operational tasks incidental to a total closing of the facility does not prevent the court's finding that a complete withdrawal has occurred.[11] Thus, we find the district court did not err as a matter of law in finding a complete withdrawal had occurred for DEFRA purposes.
 
 IV.
 
 45
 We conclude that the district court did not err in finding Crown Cork exempt from withdrawal liability because it complied with DEFRA. Accordingly, we will affirm the decision of the district court.
 
 
 46
 Present: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS and GARTH,* Circuit Judges.
 
 SUR PETITION FOR REHEARING
 
 47
 Jan. 19, 1993.
 
 
 48
 The petition for rehearing filed by appellants in the above entitled case having been submitted to the judges who participated in the decision of this court and to all other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Judges Greenberg, Nygaard, Alito and Roth would have granted rehearing.
 
 
 
 [1]
 Under its collective bargaining agreement with Local 688, Crown Cork was obligated to make pension contributions to the Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund")
 
 
 [2]
 On September 13, 1989 the Pension Fund filed an action in the United States District Court for the Northern District of Illinois, Central States, etc., et al. v. Crown Cork & Seal Co., No. 89-6943 (N.D.Ill. March 7, 1990), to enforce a claim it had made for interim payments. The Illinois action was stayed pending disposition of the case in the Eastern District of Pennsylvania
 On October 23, 1989, the United States District Court for the Eastern District of Pennsylvania entered an order on remand which directed the parties to proceed promptly to arbitration, stayed the matter pending arbitration and enjoined further proceedings in Illinois. The Pension Fund appealed this order. At our urging, a stipulation was entered which resulted in the dismissal of that appeal. Crown Cork & Seal Co. v. Central States Southeast, etc., et al., No. 89-2014, Order and Motion (3d Cir. May 25, 1990). As part of this stipulation, Crown Cork commenced interim monthly payments to the Pension Fund in June, 1990.
 
 
 [3]
 The arbitrator interpreted DEFRA's requirement of a "binding agreement to withdraw" as requiring "the existence of an enforceable agreement on or before September 26, 1980 committing Crown Cork to sell its assets." The arbitrator found that Crown Cork's listing agreement with Turley Martin was not "a vehicle to force Crown Cork to sell its plant if it chose not to." Award at p. 7
 
 
 [4]
 Section 558 provides in relevant part:
 Elimination of Retroactive Application of Amendments Made by Multiemployer Pension Plan Amendments Act of 1980.
 (a) In General--
 (1) Liability. Any withdrawal liability incurred by an employer pursuant to part 1 of Subtitle E of title IV of the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1381 et seq.) as a result of a complete or partial withdrawal of such employer from a multiemployer plan before September 26, 1980 shall be void.
 (d) Special Rule For Certain Binding Agreements--In the case of an employer who, on September 26, 1980, has a binding agreement to withdraw from a multiemployer plan, subsection (a)(1) shall be applied by substituting 'December 31, 1980' for 'September 26, 1980.'
 Pub.L. No. 98-369, 98 Stat. 494,899, reprinted in "Historical Note" accompanying 29 U.S.C.A. § 1381 (1985).
 
 
 [5]
 Arbitrator Duff did not reach the issue of whether, in fact, Crown Cork had effectuated a complete withdrawal before December 31, 1980, because he concluded that Crown Cork did not have a binding agreement to withdraw. However, he did find that "de facto Crown was committed to its plan to close the St. Louis Plant" before September 26, 1989. (A. 1012)
 
 
 [6]
 "Under the bill, in the case of an employer who, on September 26, 1980, had a binding sale agreement to withdraw from a multiemployer plan, the effective date of withdrawal liability is changed to December 31, 1980." Staff of Joint Committee on Taxation, 98th Cong., 2d Session, General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984, at 893 (1985) (General Explanation)
 
 
 [7]
 The issue is not only whether an employer "could" form an agreement to withdraw from a plan, but whether it is likely that anyone would agree to be bound by it. Counsel for the Pension Fund conceded as much at oral argument when he noted that it was unlikely that the Pension Fund would have signed such an agreement had Crown Cork presented it
 
 
 [8]
 Congress made two findings in enacting DEFRA and removing MPPAA's retroactivity provision. First, Congress recognized that most of the employers who withdrew between April 29 and September 26, 1980 would have done so regardless of the effective date of MPPAA because these employers had valid reasons extrinsic to MPPAA for withdrawing from their multiemployer pension plans. Congress further recognized that many employers who withdrew during the period of retroactivity not only did not do so in anticipation of MPPAA, but were instead surprised by its enactment. Because these employers had failed to anticipate the retroactive withdrawal provisions, they were exposed to large unexpected liabilities. Long Island Oil Products Co. v. Local 553 Pension Fund, 775 F.2d 24, 28 (2d Cir.1985). Here too, Crown Cork's July, 1980 decision to close the St. Louis Plant was a legitimate business decision based on decreased demand for its product. Indeed, the district court found that there were no bad faith attempts on the part of the company to alter its course of conduct to avoid withdrawal liability. Opinion at p. 864
 
 
 [9]
 The Pension Fund asserts that because Crown Cork was obligated to contribute to the plan until November, 1981, it did not effect a complete withdrawal until these contributions ceased
 Crown Cork counters that, in order for "cessation of operations" to have a meaning separate from "cessation of contributions", it must be construed to mean the cessation of production activity. Crown Cork maintains that if "cessation of operations" is limited to what the Pension Fund claims, every cessation of operations would necessarily be a cessation of contributions to the plan. By equating "operations" to that which is necessary to produce a "contribution," the Pension Fund is making a cessation of the obligation to contribute the sole test of "withdrawal." This would render the definition of withdrawal that turns on the cessation of operations a nullity.
 
 
 [10]
 The parties before us have stipulated that the sole activities after October 10, 1980 were tasks performed by just four employees incidental to plant closing. The Allied Products Company in Allied Products could not make this claim. Although Allied informed its union in June 1982 of its intent to close its Bedford plant, the court, found that Allied still received, processed and filled seven purchase orders during 1983. 872 F.2d at 209. Thus normal business activity and normal operations, and not just shut down work, had continued past the withdrawal date in dispute. In contrast, Crown Cork had completely ceased production well before the date the Pension Fund claims for withdrawal
 
 
 [11]
 See, e.g., Speckman v. Barford Chevrolet Co., 535 F.Supp. 488 (E.D.Mo.1982) (a complete withdrawal can occur even if the employer retains employees on its payroll to terminate the business, thus a car dealership which had terminated all but one of its employees from a preclosure work force of 18, to assist the employer in the winding up of the employer's automobile dealership business and whose remaining employee was not engaged in selling cars had completely withdrawn); Textile Workers Pension Fund v. Standard Dye & Finishing Co., 607 F.Supp. 570 (S.D.N.Y.1985) (employer was not obligated to pay withdrawal assessments even though it maintained skeleton crew of three employees to aid in clean up work and dismantling of a dye and textile plant and made contributions on behalf of these employees); Connors v. Economy Bldg. Systems, 651 F.Supp. 849 (D.D.C.1986) (court determined that employer had completely withdrawn when it ceased "the business activity that gave rise to contributions to the plan, i.e., construction activity); F.H. Cobb Co. v. New York State Teamsters Conference Pension & Retirement Fund, 584 F.Supp. 1181 (N.D.N.Y.1984) (where employer retained a small group of employees, ranging in number from nine to sixteen and representing between 5-9 percent of the company's preclosure workforce to move inventory and equipment, employer had ceased covered operations under MPPAA). Accord ILGWU National Retirement Fund v. Weatherall Fashions, Inc., No. 94-Cir. 9722, slip op. 1986 W.L. 2757 (S.D.N.Y.1986). But see Combs v. Leishman, 691 F.Supp. 424 (D.C.Dist.Col.1988) (employer had not withdrawn, although its operations were winding down, where it maintained its mining activities at levels not substantially different than normal work periods)
 
 
 *
 Senior Circuit Judge Garth voted only as to panel rehearing