## ALMACS, INC. (RHODE ISLAND PRODUCE COMPANY)

### v.

## NEW ENGLAND TEAMSTERS AND TRUCKING INDUSTRY PENSION FUND.

C.A. No. 92–0246L.

United States District Court, D. Rhode Island.

Aug. 6, 1993.

John B. Rosenquest, III, Edwards & Angell, Providence, RI, for plaintiff.

Richard W. MacAdams, MacAdams & Wieck, Providence, RI, Randall E. Nash, Grady & Dwyer, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties have presented the case on stipulated facts. They agree that the sole issue before the Court is a purely legal question arising under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1988 & Supp.1992), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.* (1988 & Supp.1992). Plaintiff, Almacs, Inc. ("Almacs"), claims that the withdrawal liability assessed against it by defendant, New England Teamsters and Trucking Industry Pension Fund (the "Fund"), is excessive as a matter of law. Specifically, Almacs argues that, in contravention of the MPPAA, the Fund included benefits attributable to "Past Service Credits" in its calculation of "nonforfeitable benefits." The Fund, on the other hand, contends that benefits attributable to "Past Service Credits" are "nonforfeitable benefits" under the MPPAA and, thus, the Fund correctly calculated the withdrawal liability owed by Almacs.

### BACKGROUND

The Fund is a multiemployer pension fund which administers the New England Teamsters and Trucking Industry Pension Plan (the "Plan"), a multiemployer pension plan, as defined by ERISA and the MPPAA. 29 U.S.C. §§ 1002(37)(A), 1301(a)(3). The Fund is regulated under the relevant provisions of ERISA, 29 U.S.C. § 1001 *et seq.* Pursuant to collective bargaining agreements between the employers and participating New England Teamsters Locals, the Fund collects contributions from employers and provides benefits to the employees of these contributing employers.

For a number of years, Almacs contributed to the Fund on behalf of certain employees

who were covered by a collective bargaining agreement with a local union affiliated with the International Brotherhood of Teamsters. In July 1989, Almacs withdrew from the Plan. The MPPAA requires employers withdrawing from multiemployer pension plans to pay the plan a sum known as withdrawal liability. 29 U.S.C. § 1381. The withdrawal liability essentially represents the withdrawing employer's pro rata share of the pension plan's "unfunded vested benefits." 29 U.S.C. §§ 1381, 1391; see Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984); Debreceni v. Merchants Terminal Corp., 889 F.2d 1, 2 (1st Cir.1989). A plan's "unfunded vested benefits" equals the excess of the present value of the plan's "nonforfeitable benefits" over the current value of the plan's assets. 29 U.S.C. § 1393(c); see R.A. Gray & Co., 467 U.S. at 725, 104 S.Ct. at 2715. For purposes of determining withdrawal liability, the plan's "nonforfeitable benefits" are the benefits for which participants have met the conditions for entitlement, whether or not the benefits may subsequently be reduced or suspended due to a plan amendment, an occurrence of any condition, or operation of ERISA or the Internal Revenue Code. 29 U.S.C. § 1301(a)(8).

At issue in this case is the Fund's inclusion of benefits attributable to "Past Service Credits" in its calculation of "nonforfeitable benefits." For the most part, the Plan provides benefits to participants and their beneficiaries based on both the level of hourly contributions made by an employer on behalf of the participant and the number of years of pension credits the participant earned. The Plan uses the number of years of pension credits a participant earns to determine whether the participant is eligible for certain benefits under the Plan, such as regular pension benefits, reduced pension benefits, early retirement pension benefits, minimum thirty-year service pension benefits, and disability benefits. For some of these benefits, the number of years of pension credits also affects the level of benefits the participant or beneficiary receives.

Under the Plan, participants receive pension credits for their service to an employer during the years that the employer contributes to the Plan ("contribution period"), as well as for their service to the employer before the employer began contributing to the Plan. The Court will refer to the latter type of pension credits as "Past Service Credits." Some participants rely, or will rely, on Past Service Credits to attain the minimum amount of pension credits required to qualify for the Plan's pension benefits. For participants who are, or will be, eligible for benefits without including Past Service Credits, Past Service Credits may increase the level of their benefits. The Court will refer to the benefits and the increase in benefit level attributable to Past Service Credits as "Past Service Benefits." The Plan permits participants to accumulate up to two years of Past Service Credits for each year of pension credits the participant earns during the contribution period. However, participants who have not attained age fifty-two and earned at least fifteen years of pension credits can lose all of their previously acquired pension credits if they incur a "break-in-service" by failing to complete the required minimum number of hours of service per year.

Importantly, the Plan also provides additional conditions under which a participant's Past Service Credits may be cancelled. Under Section 2.07, Past Service Credits arising from service to a particular employer may be cancelled if the Fund Trustees terminate that employer's participation in the Fund because the employer either failed to make required contributions or was no longer obligated under a collective bargaining agreement to contribute to the Plan. Specifically, Section 2.07(b)(1) provides:

> If the Trustees terminate an Employer's participation in this Fund . . . , the Trustees may cancel that part of any pension for which a person was made eligible because of employment in [a] bargaining unit prior to the period for which the Employer had an obligation to contribute with respect to that unit and all Pension Credit which a person had accumulated for employment in such bargaining unit before the Employer had an obligation to contribute with respect to that unit. . . .

However, the Trustees may waive such cancellation of Past Service Benefits under certain circumstances. Specifically, Section 2.07(b)(2) states:

> The Trustees may waive, in whole or in part, the cancellation otherwise required by subparagraph (1) where one of the following circumstances exists:
>
> (i) The Participant's Employer had no chronic, uncured Contribution delinquency at the time such Employer's participation in the Plan ceased;
>
> (ii) The Participant was a Pensioner at the time his Employer's participation in the Plan ceased;
>
> (iii) The Participant had not, after his Employer's participation ceased, engaged in employment or self-employment in the same or related business as any employer participating in the Plan, or in any business which is or may be under the jurisdiction of a Local Union or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America; or
>
> (iv) The Participant's employer had made, unless bankrupt or insolvent at that time, all withdrawal liability payments required by the Plan.

Pursuant to Section 2.07, the Fund Trustees have cancelled the Past Service Credits of participants whose employers have either been delinquent with contributions or withdrawn from the Plan. The Trustees have also waived such cancellation of Past Service Credits.[1] Along these lines, the parties provided the Court with a list of 598 employers whose delinquency to or withdrawal from the Fund resulted in the cancellation of all Past Service Credits attributable to employment with that employer. As of April 1990, the Trustees had reinstated the cancelled Past Service Credits attributable to employment with 173 of these 598 employers.

In this case, after Almacs withdrew, the Fund worked through the withdrawal liability calculation, characterizing benefits attributable to Past Service Credits as "nonforfeitable benefits." About eight months after

Almacs withdrew, pursuant to 29 U.S.C. § 1399(b)(1), the Fund notified Almacs that it had been assessed a withdrawal liability of $1,123,529.00. In accordance with its rights under the mandatory review and arbitration procedures, 29 U.S.C. §§ 1399, 1401, Almacs challenged the Fund's assessment as excessive. Almacs timely filed a request for review and demand for arbitration.

The case was presented to an arbitrator on stipulated facts. Almacs argued that the Fund had artificially inflated its "unfunded vested benefits" by erroneously including Past Service Benefits in its calculation of "nonforfeitable benefits." Almacs acknowledged that the Past Service Benefits, including those attributable to service with Almacs, had not been cancelled as of the time relevant for computing the Fund's "nonforfeitable benefits." However, Almacs argued that, since the Fund Trustees routinely cancel Past Service Benefits under Section 2.07 of the Plan after an employer withdraws, Past Service Benefits are not "nonforfeitable benefits" for purposes of determining withdrawal liability. Almacs claimed that a common sense reading of the definition of "nonforfeitable benefits" in Title IV of ERISA, a comparison of that Title IV definition with the definition of "nonforfeitable" in Title I of ERISA, as well as an understanding of the purpose of withdrawal liability supported its view. The Fund, however, argued that the Title IV definition of "nonforfeitable benefits," informed by the Title I definition of "nonforfeitable," as well as the purpose of the MPPAA required it to include the Past Service Benefits in withdrawal liability assessments.

The arbitrator found in favor of the Fund, and, pursuant to 29 U.S.C. § 1401(b)(2), Almacs appealed to this Court seeking a modification of the arbitrator's award. This Court's jurisdiction over this matter is based on 29 U.S.C. §§ 1401(b)(2), 1451(c). The parties ask the Court to resolve the identical legal issue they presented to the arbitrator. After hearing oral arguments, the Court took the matter under advisement. It is now in

---

1. The parties stipulated that the Fund Trustees have waived cancellation of Past Service Benefits at "appropriate times." However, the parties did not indicate to the Court the facts and circumstances which determine whether waiver is or is not appropriate.

order for decision. For the reasons set forth below, the Court decides in favor of the Fund, and, thus, grants the Fund's motion for summary judgment and denies Almacs' cross motion.

## DISCUSSION

### I. Standard of Review

As set forth above, this case requires interpretation of the statutory phrase "nonforfeitable benefits." Specifically, the issue is whether benefits attributable to "Past Service Credits" fit within the MPPAA definition of "nonforfeitable benefits." Since the question is strictly a legal one, the arbitrator's decision is not entitled to judicial deference, and the Court will review the legal issue *de novo*. See *Crown Cork & Seal Co. v. Central States S.E. and S.W. Areas Pension Fund*, 982 F.2d 857, 860 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2961, 125 L.Ed.2d 662 (1993); *Huber v. Casablanca Indus., Inc.*, 916 F.2d 85, 89 (3d Cir.1990), *cert. dismissed*, —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *United Foods, Inc. v. Western Conference of Teamsters Pension Trust Fund*, 816 F.Supp. 602, 607 (N.D.Cal.1993).

In this case, the parties have filed cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The standard for ruling on a summary judgment motion is set forth in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Further, the Court must view the facts and all inferences therefrom in the light most favorable to the nonmoving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 373 (1st Cir.1991). Here, the parties agree that there are no genuine issues as to any material fact. Therefore, by resolving the legal issue, the Court will determine which moving party "is entitled to a judgment as a matter of law."

### II. Withdrawal Liability Assessment

The Court must decide whether or not benefits attributable to Past Service Credits, which are subject to cancellation, are "nonforfeitable benefits" for purposes of determining withdrawal liability under Title IV of ERISA. The Court has little direct guidance, for this is an issue of first impression. The issue has not been analyzed by either the courts or the Pension Benefit Guaranty Corporation ("PBGC"), the nonprofit corporation within the Department of Labor which Congress created to administer the pension plan termination insurance program and enforce the provisions of Title IV of ERISA, see *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 210 n. 2 (7th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 143, 107 L.Ed.2d 102 (1989). Nonetheless, after analyzing the language and purpose of the statute, the Court determines that the Fund properly included benefits attributable to Past Service Credits in its calculation of "nonforfeitable benefits."

### A. General Background of ERISA

ERISA, as amended by the MPPAA, is a comprehensive statute that Congress enacted to regulate the operations of employee benefit plans and protect the interests of the participants and beneficiaries of such plans. *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361–62, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980). The statute is divided into four titles, two of which are relevant to these proceedings. Title IV, which regulates plan termination, the plan termination insurance program, and withdrawal liability, is the primary focus of this case. Title I, which sets forth the fundamental requirements of ERISA plans, including provisions regarding reporting, disclosure, funding, participation, and fiduciary responsibilities, sheds light on the disputed issues raised under Title IV.

### B. Language of the Statute

As this case involves statutory interpretation, the Court's analysis must begin with the

text of the statute. *Kwatcher v. Massachusetts Serv. Employees Pension Fund,* 879 F.2d 957, 959 (1st Cir.1989) (citing *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981)). The specific language at issue here is the definition of "nonforfeitable benefit" in Title IV of ERISA. The statute provides:

> "nonforfeitable benefit" means, with respect to a plan, a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter (other than submission of a formal application, retirement, completion of a required waiting period, or death in the case of a benefit which returns all or a portion of a participant's accumulated mandatory employee contributions upon the participant's death), whether or not the benefit may subsequently be reduced or suspended by a plan amendment, an occurrence of any condition, or operation of this chapter of Title 26.

29 U.S.C. § 1301(a)(8).

The Past Service Benefits which the Fund included in its calculation of "nonforfeitable benefits" fit squarely within this definition. The Fund included only those benefits which participants could not lose as a consequence of their own action, such as a break-in-service. Therefore, the Past Service Benefits which the Fund deemed "nonforfeitable" were "benefit[s] for which a participant ha[d] satisfied all of the conditions for entitlement under the plan."

Almacs concedes that the benefits at issue in this case were ones for which the participants had met all of the requirements for entitlement, as required by the first clause in the Title IV definition of "nonforfeitable benefits." However, Almacs contends that the Past Service Benefits fall outside of the definition's final clause. Almacs argues that the cancellation of participants' benefits is neither a reduction nor a suspension and that, since the Fund Trustees cancel the Past Service Credits as a matter of course, the cancellation does not occur as a result of a "plan amendment, an occurrence of any condition, or operation of [law]." Therefore, Almacs

claims, the Past Service Benefits cannot be "nonforfeitable benefits."

In response, the Court first notes that the initial clause of the Title IV definition of "nonforfeitable benefit," which focuses on the participant's completion of the conditions for entitlement, appears to set forth the criteria for a benefit to qualify as "nonforfeitable." Rather than adding requirements, the final "whether or not" clause seems to provide only a description of benefits which are covered by the first clause, yet do not fit within the common understanding of the term "nonforfeitable."

This focus on the *participant's* actions for determining which benefits are included in withdrawal liability also appears in the House Report accompanying the MPPAA legislation. The report states that, under the MPPAA, withdrawing employers will be responsible for a portion of the plan's "unfunded benefit obligations." It goes on to define "unfunded benefit obligations" as "the plan's unfunded liability for benefits for which participants have met service requirements (including early retirement subsidies, Social Security supplements, and vested accrued benefits)." H.R.Rep. No. 869, 2d Sess., pt. I, at 77–78 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918, 2945–46 [hereinafter H.R.Rep. No. 869, pt. I]. There is no indication in the legislative history that Congress intended to exclude benefits whose status might subsequently be altered by a plan amendment, an occurrence of a condition, or a change in the law. Thus, because the participants completed all that was required of *them* to make them eligible for the Past Service Benefits at issue in this case, the Past Service Benefits are "nonforfeitable benefits" for purposes of calculating withdrawal liability.

Additionally, even if the final clause of the Title IV definition did establish requirements for nonforfeitability, the Court determines that the Past Service Benefits would still qualify as "nonforfeitable." First, the Past Service Benefits are benefits which "may subsequently be reduced." Upon an employer's termination from the Fund, the Past Service Benefits attributable to service for that employer are cancelled, or reduced to zero. As explained above, Past Service Ben-

efits represent the benefits or additional level of benefits that a participant receives because his or her years of pension credits includes Past Service Credits. When the Past Service Credits, and simultaneously the Past Service Benefits, are cancelled, or reduced to zero, the level of benefits participants and beneficiaries receive from the Plan is reduced correspondingly.

Secondly, contrary to Almacs' argument, the cancellation of Past Service Benefits results from the "occurrence of [a] condition." When an employer is terminated from the Fund due to withdrawal or failure to contribute, the Trustees, pursuant to Section 2.07 of the Plan, cancel the portion of a participant's benefits which is attributable to past service with that employer.[2] Therefore, the termination of an employer from the Fund is the condition that triggers the reduction of participants' benefits.

Along these lines, the definition of "nonforfeitable" set forth in Title I of ERISA proves instructive. The Title I definition speaks to the exact issue with which the Court is grappling in the Title IV context in this case. Under Title I, "a right to an accrued benefit ... shall not be treated as forfeitable merely because the plan contains a provision" under which "benefits accrued as a result of service with the participant's employer before the employer had an obligation to contribute under the plan may not be payable if the employer ceases contributions to the multiemployer plan." 29 U.S.C. §§ 1002(19), 1053(a)(3)(E)(i).[3] The Title I section specifically directing that Past Service Benefits should not be deemed forfeitable solely because they are cancelable, 29 U.S.C. § 1053(a)(3)(E)(i), and the Title IV section defining "nonforfeitable benefits," 29 U.S.C. § 1301(a)(8), were enacted concurrently as part of the MPPAA. Although the Title I definition does not apply in the Title IV context, the Court agrees with the Fund that the Title I definition provides a clear example of a type of reduction or suspension envisioned by 29 U.S.C. § 1301(a)(8).

Almacs argues that because the Title I definition of "nonforfeitable" contains an explicit reference to Past Service Credits, the absence of such a reference in the Title IV definition evidences Congressional intent to exclude Past Service Benefits from the Title IV definition. Again, the Court disagrees. The Title I definition of "nonforfeitable,"

---

**2.** The Court notes that Section 2.07(b) of the Plan is ambiguous regarding both the Trustee's discretion to cancel the benefits and the timing of the optional waiver of this cancellation. In Section 2.07(b)(1), the Plan states that, upon an employer's termination, the Trustees "may" cancel the Past Service Benefits attributable to service with that employer. However, in Section 2.07(b)(2), the Plan states that under specified conditions, the Trustees "may waive, in whole or in part, the cancellation *otherwise required* by subparagraph (1)...." (emphasis added). Under one interpretation, the Trustees decide whether or not to waive the cancellation of Past Service Benefits before the cancellation occurs. Alternatively, Section 2.07(b) could require cancellation upon the termination of an employer from the Plan, but allow the Trustees to decide at a later date whether or not to reinstate the cancelled Past Service Benefits.

The Court notes that the stipulated facts provided to the Court by both parties suggest that the Fund follows the latter interpretation, cancelling the benefits and then later determining whether to reinstate them. However, even if the former interpretation is accurate, the cancellation of the Past Service Benefits can still be characterized as resulting from the occurrence of a condition. The Trustees' decision, triggered by the termination of an employer from the Plan and guided by both the narrow constraints in the Plan and the fiduciary duties imposed by ERISA, could constitute the "condition" which results in the cancellation of Past Service Benefits.

**3.** Specifically, Title I provides:

The term "nonforfeitable" when used with respect to a pension benefit or right means a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan. For purposes of this paragraph, a right to an accrued benefit derived from employer contributions shall not be treated as forfeitable merely because the plan contains a provision described in section 1053(a)(3) of this title. 29 U.S.C. § 1002(19). Section 1053(a)(3)(E)(i), in turn, provides:

A right to an accrued benefit derived from *employer contributions under a multiemployer plan* shall not be treated as forfeitable solely because the plan provides that benefits accrued as a result of service with the participant's employer before the employer had an obligation to contribute under the plan may not be payable if the employer ceases contributions to the multiemployer plan.

through reference to 29 U.S.C. § 1053(a)(3), addresses a number of specific situations in which a right to an accrued benefit should not be treated as forfeitable. In addition to discussing Past Service Benefits, 29 U.S.C. § 1053(a)(3)(E)(i), Section 1053(a)(3) provides that a right to an accrued benefit is not forfeitable solely because the plan includes a provision under which benefits may not be paid if the participant either dies, 29 U.S.C. § 1053(a)(3)(A), or accepts employment after the payment of his or her benefits has commenced, 29 U.S.C. § 1053(a)(3)(B), or withdraws his or her own mandatory contributions from the plan, 29 U.S.C. § 1053(a)(3)(D). Section 1053(a)(3) also states that the retroactive application of plan amendments, 29 U.S.C. § 1053(a)(3)(C), and plan amendments reducing benefits during reorganization, 29 U.S.C. § 1053(a)(3)(E)(ii), do not render benefits forfeitable. In contrast, the Title IV definition mentions no specific examples of conditions or plan amendments that may cause benefits to "subsequently be reduced or suspended." 29 U.S.C. § 1301(a)(8). Therefore, the absence in the Title IV definition of an explicit reference to Past Service Benefits, as an example of benefits which are not forfeitable although they may be reduced, is not telling.

## C. Case Law

Although neither party presents any cases directly on point, Almacs argues that *Walter v. International Ass'n of Machinists Pension Fund*, 949 F.2d 310 (10th Cir.1991), indirectly supports its interpretation of "nonforfeitable benefits." *Walter* dealt with the transfer provisions in Title IV of ERISA. *Id.* In *Walter*, plaintiff's bargaining unit voted to transfer from the International Association of Machinists and Aerospace Workers Pension Plan (the "IAM Plan") to the Central States Pension Plan (the "Central Plan"). *Id.* at 311. The IAM Plan, however, contained a provision under which participants' Past Service Credits were cancelled if their employer ceased contributing to the plan. *Id.* at 313. When plaintiff's employer, Lee Way, ceased contributing to the IAM Plan, and commenced contributing to the Central Plan, the IAM Plan cancelled the Past Service Credits attributable to participants' em-

ployment with Lee Way. *Id.* Under ERISA, the IAM Plan had to "transfer 'the appropriate amount of assets and liabilities to the new plan.'" *Id.* at 314 (quoting 29 U.S.C. § 1415(b)(3)). ERISA defines "the appropriate amount of assets" as " 'the amount by which the value of the nonforfeitable benefits to be transferred exceeds the amount of the employer's withdrawal liability to the old plan....'" *Id.* (quoting 29 U.S.C. § 1415(g)(1)). The IAM Plan did not transfer assets and liabilities that would have been attributable to the cancelled Past Service Benefits, and plaintiff sued. *Id.* at 313–14. In this context, the Tenth Circuit held that Past Service Benefits could be "forfeited" and that the IAM Plan did not have to transfer assets and liabilities attributable to the "forfeited" benefits. *Id.* at 314.

Almacs argues that *Walter* supports the proposition that the cancellation of Past Service Benefits constitutes a forfeiture in the Title IV context. The Court disagrees. First, although the Court in *Walter* described the cancellation provision as a "forfeiture," it did so without any reference to or analysis of the definition of "nonforfeitable benefits". *Id.* at 311–14. That Court simply used the terms cancellation and forfeiture interchangeably. *Id.* Secondly, in the instant case, the Past Service Benefits are subject to cancellation, rather than already cancelled, as of the time relevant for determining which benefits are "nonforfeitable." *Walter*, on the other hand, involved Past Service Benefits which had already been cancelled. *Id.* at 313–14. In the *Walter* case, the Court determined that the "nonforfeitable benefits to be transferred" did not include the Past Service Benefits that the IAM Plan had already cancelled before the time to transfer benefits occurred. *Id.* However, as the Fund points out, such a conclusion does not suggest that the Past Service Benefits were never "nonforfeitable," but only that they were not being "transferred." Therefore, *Walter* provides little support for Almacs' interpretation of the statute.

## D. Purpose of the Statute

As noted briefly above, Congress enacted ERISA in 1974 to protect workers and their

families from losing employee benefits to which they are entitled. *Nachman Corp.*, 446 U.S. at 361–62, 100 S.Ct. at 1726. However, the 1974 Act did not cure all of the problems which threatened the solvency of employee benefit plans. In a 1978 report, the PBGC revealed that "ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate [sic] their participation in, or withdraw [sic] from, multiemployer plans." *R.A. Gray & Co.*, 467 U.S. at 722, 104 S.Ct. at 2714. Under pre-MPPAA ERISA rules, employers withdrawing from a multiemployer plan more than five years before the plan terminated owed no obligation to help fund the plan's liabilities. *United Foods*, 816 F.Supp. at 610; H.R.Rep. No. 869, pt. I, at 54. On the other hand, employers who remained with a plan until the plan terminated, or who withdrew from the plan within five years of its termination, were liable to the PBGC for unfunded vested benefits, up to 30 percent of the employer's net worth. *United Foods*, 816 F.Supp. at 610; H.R.Rep. No. 869, pt. I, at 54. This scheme created perverse incentives for employers to withdraw from troubled plans to avoid being stuck "holding the bag" for future liability. *United Foods*, 816 F.Supp. at 610; *see also Debreceni*, 889 F.2d at 5; H.R.Rep. No. 869, pt. I, at 54. Congress was concerned that such incentives "would hasten the demise of many multiemployer plans, and overburden the resources of the PBGC...." *Berkshire Hathaway, Inc. v. Textile Workers Pension Fund*, 874 F.2d 53, 54 (1st Cir.1989).

Congress enacted the MPPAA to alleviate the problems facing multiemployer pension plans. *R.A. Gray & Co.*, 467 U.S. at 723, 104 S.Ct. at 2714. "The policy of the [MPPAA] ... is ... (1) to protect the interests of participants and beneficiaries in financially distressed multiemployer plans, and (2) to encourage growth and maintenance of multiemployer plans." H.R.Rep. No. 869, 2d Sess., pt. II, at 12 (1980), *reprinted in* 1980 U.S.C.C.A.N. 2918, 3002. Withdrawal liability was one of the principal tools Congress designed to achieve these goals. *R.A. Gray & Co.*, 467 U.S. at 723, 104 S.Ct. at 2714. Withdrawal liability, which requires withdrawing employers to pay their fair share of the plan's unfunded vested liabilities, "is intended to ensure that 'the financial burden of [the] employees' vested pension benefits will not be shifted to the other employers in the plan....'" *Connors v. Incoal, Inc.*, 995 F.2d 245, 248 (D.C.Cir.1993) (quoting *Central States, S.E. and S.W. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1371 (7th Cir.1992)).

In this case, Almacs argues that, since it is withdrawing from the Plan, its employees' Past Service Benefits are going to be cancelled. Although the benefits existed at the relevant time for determining the Plan's "nonforfeitable benefits," Almacs claims that the goals of the MPPAA are not advanced by requiring the withdrawing employer to fund benefits that are going to be cancelled. Almacs argues first that, even if its withdrawal liability payment does not cover its employees' Past Service Benefits, because the Plan warns that these benefits may be cancelled, the participants would not be in jeopardy of losing benefits promised to them. Secondly, Almacs contends that, under its interpretation of "nonforfeitable benefits," the remaining employers would not be forced to bear the burden of funding benefits attributable to service with Almacs because the benefits will be cancelled. Thus, Almacs claims, Congress could not have intended withdrawal liability to cover these cancelable Past Service Benefits.

Despite Almacs' argument, the Court is not convinced that it misinterpreted the language in the statute. In fact, the Court concludes that its interpretation is consistent with Congress's desire to protect remaining employers from unfair burdens as well as with the notion that "ERISA ... is remedial legislation which should be liberally construed in favor of protecting participants in employee benefits plans." *United Foods*, 816 F.Supp. at 611 (quoting *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984)).

First, Almacs' reasoning ignores Past Service Benefits attributable to service for the contributing employers which are not withdrawing from the Plan. As Almacs recognizes, the majority of employers never withdraw from multiemployer plans, thus leaving

the plans obligated to pay out the majority of Past Service Benefits.[4]

Second, as evidenced by the final clause in the Title IV definition of "nonforfeitable benefits," Congress recognized that plans might never have to pay out some of the benefits which Congress nevertheless required withdrawing employers to fund. *See* 29 U.S.C. § 1301(a)(8); *cf. United Foods*, 816 F.Supp. at 611–13 (disability and early retirement benefits not forfeitable despite fact that might never be paid out by plan). Additionally, although the Fund Trustees may cancel Past Service Benefits pursuant to Section 2.07(b)(1), the Trustees may reinstate, and in many instances have reinstated, such cancelled benefits. The Plan could thus be liable for paying out Past Service Benefits attributable to service for Almacs. Therefore, to ensure that the responsibility of subsidizing these benefits does not unfairly fall on the shoulders of the remaining employers, Congress requires Almacs to provide funds for these benefits through the payment of withdrawal liability.[5]

## CONCLUSION

In accordance with the foregoing analysis, the Court determines that the Fund correctly included Past Service Benefits in its computation of "nonforfeitable benefits." Therefore, the Court grants the Fund's motion for summary judgment and denies Almacs' cross motion. The Clerk will enter judgment for the Fund forthwith.

It is so Ordered.

---

4. In discussing the purpose of the statute, Almacs implies that, since withdrawal liability is intended to represent the withdrawing employer's share of the unfunded benefits, the only Past Service Benefits which matter for determining its withdrawal liability are those earned through service with Almacs. Nonetheless, for several reasons, the Court finds it necessary to address Past Service Benefits attributable to service for employers other than Almacs. Importantly, at other points in its argument to the Court, Almacs' seems to contend that the Past Service Benefits of all of the participants in the Plan are forfeitable because they are all potentially subject to future cancellation. Additionally, the Fund contends that all participants' Past Service Benefits must be considered because the Plan calculates withdrawal liability via the modified presumptive method, rather than the direct attribution method. The Fund claims that withdrawal liability for the Plan is based not on the total amount of benefits earned by the withdrawing employer's employees, but rather on a percentage of all of the benefits earned by all of the Plan's participants. Therefore, although the Court need not determine the impact that Past Service Benefits derived from service with employers other than Almacs should have on Almacs' withdrawal liability, for completeness sake, the Court notes that it is convinced that the Past Service Benefits attributable to service with nonwithdrawing employers, as well as to service with Almacs, are "nonforfeitable benefits."

5. As discussed at note 2 above, Section 2.07(b) of the Plan could be interpreted as requiring cancellation of Past Service Benefits automatically upon an employer's withdrawal, but allowing the Trustees to later reinstate such benefits. However, if Section 2.07 is interpreted as granting the Trustees discretion to decide whether to waive the cancellation of Past Service Benefits before the cancellation occurs, the conclusion that Congress intended the cancelable Past Service Benefits to be "nonforfeitable" is even more compelling. Under the latter interpretation, the benefits, while subject to cancellation, might never be cancelled. Accordingly, requiring Almacs to subsidize the benefits would be necessary to achieve Congress's goal of protecting plans and their remaining contributing employers from unfairly shouldering the burdens of funding Past Service Benefits which the plan promises to pay out.